92 Wis.2d 696 (1979)
285 N.W.2d 880
J.B., Plaintiff-Respondent,
v.
A.F., and another, Defendants-Appellants:
DEPARTMENT OF SOCIAL SERVICES, VERNON COUNTY, Defendant:
J.C.F., Defendant-Respondent.
No. 78-695.
Court of Appeals of Wisconsin.
Argued August 2, 1979.
Decided September 14, 1979.
*697 For the defendants-appellants there was a brief by Alvin L. Woodmansee of Viroqua, and oral argument by Alvin L. Woodmansee.
For the defendant-respondent J.B. there was a brief by Kathleen C. Mann of La Crosse and oral argument by Kathleen C. Mann.
For the defendant-respondent J.C.F. there was a brief by Charles G. Norseng, guardian ad litem for J.C.F., and oral argument by Charles G. Norseng, of Chippewa Falls.
Before Gartzke, Bablitch, J. and Dykman, J.
GARTZKE, P.J.
This is an appeal from the judgment of the circuit court for Vernon County which declared that the plaintiff, J.B., is the natural father of Joshua.[1] Joshua was born September 9, 1974. His *698 mother died October 20, 1976. She was unmarried between Joshua's birth and her death. Appellants are the parents of the deceased mother. The child is in the temporary custody of the Department of Social Services.
The circuit court found that the plaintiff and the mother had an intimate and continuing relationship from the summer of 1968 until the death of the mother and that they engaged in sexual relations during the period of conception of Joshua. The court found that expert testimony based on genetic tissue typing showed that there was a less than 1% chance that plaintiff was not the father of Joshua. The court concluded that plaintiff's paternity of Joshua was established by clear, satisfactory and convincing evidence.
The issues are:
1. Are the results of HLA tissue typing tests performed on the blood cells of the putative father and the child admissible evidence to establish paternity?
2. If the results are inadmissible, are the findings of the circuit court that the plaintiff is the natural father contrary to the great weight and clear preponderance of the evidence?
3. If the results are inadmissible, should a new trial be ordered?
1. Admissibility Of HLA Test Results
Dr. Fritz H. Bach is a Professor of Medical Genetics and of Surgery and Director of the Immunobiology Research Center at the University of Wisconsin and an expert on HLA testing. He supervised the taking of blood samples from plaintiff and Joshua and HLA tissue typing tests on their cells. The court permitted Dr. Bach to testify that the tests of the blood cells of plaintiff and Joshua disclosed certain antigens held in common by plaintiff and Joshua. There is less than a 1% probability *699 that two persons having these particular antigens in common are not parent and child.
If the HLA tests are "blood tests" within the meaning of sec. 885.23, Stats., then the test results are inadmissible because the results were offered to prove that plaintiff is Joshua's father. Section 885.23 provides,
Whenever it is relevant in a civil action to determine the parentage or identity of any child, person or corpse, the court, by order, shall direct any party to the action and any person involved in the controversy to submit to one or more blood tests as provided in s. 52.36. The results of said tests shall constitute conclusive evidence where exclusion is established and shall be receivable as evidence, but only in cases where a definite exclusion is established. Whenever the court orders such blood tests and one of the parties refuses to submit to such tests such facts shall be disclosed upon trial. Notwithstanding s. 52.36(2) the court shall determine how and by whom the costs of such examination shall be paid. (Emphasis added.)
Section 52.36, Stats., provides that the court shall at the request of a party order the taking of blood tests by physicians having certain qualifications. The term "blood test" is not defined in secs. 52.36 and 885.23.
Appellants argue that the HLA tests are blood tests because blood was drawn from plaintiff and Joshua. Plaintiff argues that HLA tests are not blood tests because the tests could have been made without withdrawing blood. The circuit court admitted the test results and Dr. Bach's testimony as to the probabilities that plaintiff is Joshua's father because HLA tissue typing is universally recognized and accepted in medical science.
Dr. Bach was not asked whether an HLA test is a "blood test." One suspects that the question would not have made sense to him. It is not blood itself that is tested. It is rather the characteristics of the constituents of blood which are determined and from which conclusions *700 are drawn based on Mendelian laws of inheritance.
Dr. Bach described HLA tissue testing as a procedure which is analogous to red blood cell typing for the ABO blood group system. It is possible under the ABO system to exclude parentage. It is also possible under the ABO system to determine within statistical limits the chances that a parent and child will each have a certain antigen found on their red blood cells. The advantage of an HLA test is that it may disclose rare antigens on the cells of two people which they probably have in common because of genetic inheritance rather than through mere chance. An HLA test may show that the probability of paternity is extremely high, although it can never establish the fact of paternity with certainty.[2]
*701 Dr. Bach's description of HLA "tissue" testing does not require the conclusion that an HLA test is not a blood test. Blood is a "fluid tissue which circulates . . . [and] supplies oxygen and food to the other tissues of the body . . ." Blakiston's, Gould Medical Dictionary (Third ed. 1972). Dr. Terasaki refers to page 543 of the article cited in footnote 2 to "the HLA system of tissue types" and at lage 554 of the same article to the HLA system as a blood test.
HLA testing involves antigens found in most tissues of the body, including the liver and kidneys, and not just the blood as in the ABO and other systems. The fact that the HLA test as to plaintiff and Joshua is based upon their blood samples rather than other tissue samples is not decisive as to whether an HLA test is a "blood test."
Section 885.23, Stats., adopts a highly restrictive approach to the use of medical evidence in paternity disputes. It states that blood test results "shall be receivable as evidence, but only in cases where a definite exclusion is established." (Emphasis added.)
A restrictive approach was justified by the state of medical knowledge, so far as we can determine, when sec. 325.23, Stats., the predecessor to sec. 885.23, Stats., was created by ch. 351, Laws of 1935. (Section 325.23 was renumbered by sec. 2, ch. 66, Laws of 1965). Two blood systems were used for testing purposes in paternity *702 cases at that time: the ABO blood system and the MN system.[3] Both systems involve use of the characteristics of certain antigens. The RH blood factor was discovered in 1940, as a result of which complex antigens were found to exist and the Rh system began to be used in paternity cases. The blood factor S was added to the MN system on the basis of a separate antigen discovered in 1947.
If only the ABO system test is used, the probability is low that a male who in fact is not the father of a child will be excluded by the test: 17.74% for blacks, 13.42% for whites and 19.17% for Japanese. If the MNS and Rh tests are also performed, the cumulative probability rises to 54.5% for blacks, 56.63% for whites and 52% for Japanese.[4]
A remarkable advance in the number and accuracy of paternity tests has occurred during the life of sec. 885.23, Stats., and its predecessors. By 1975, at least 57 systems based upon examination of red blood cells, white blood cells, plasma, serum, saliva and urine had been discovered, not including HLA. See Margery W. Shaw and Miriam Kass, Illegitimacy, Child Support, and Paternity Testing, 13 Houston L. Rev. 41 (1975), appendix at 60-62. The Joint AMA-ABA Guidelines (see footnote 4) were written in 1976 and state that as many as 62 "immunologic *703 and biochemical systems are potentially applicable . . ." including HLA.[5]
Dr. Bach testified that HLA tissue typing has been a standard medical procedure for about a decade. It is relied on in organ transplants and in diagnosing diseases where an association is known to exist between the disease and certain antigens. Statistical tables were developed in 1972 from which the probability of two persons sharing certain common antigens may be determined. Dr. Bach relied on the most recent tables based on data collected in 1977.
HLA testing has dramatically increased the accuracy with which probabilities can be determined. The mean probability of excluding a male who in fact is not the father of a child through HLA testing, alone, is between 78% and 80% for blacks, whites and Japanese.[6] If six systems (ABO, Rh, MNSs, Kell, Duffy and Kidd) plus HLA are used, the cumulative probability of excluding a male who in fact is not the father of a child rises to 91.21% for blacks, 93.34% for whites and 91.42% for Japanese.[7] Dr. Terasaki states:
The ideal paternity test would separate the putative fathers into two categories: exclusion and inclusion with 100% probability. The characteristic of this test would be the use of determinants that are under strict genetic control, are easy to detect, and are so rare that no other random individual could possess them. The expression of these determinants must be codominant, in the sense that a given determinant present in a child must be expressed in one of the parents. The determinants must be fully expressed at birth, remain unchanged throughout life, and be unaffected by any environmental effects. The HLA system at the present is the only blood test that approaches fulfilling all of these requirements.[8]
*704 . . . .
By selectively adding other tests to the HLA testing, it would be possible to increase the percent probability of paternity and to exclude some fraction of the males who fall in the nonexclusion category.[9]
Sussman, Paternity Testing by Blood Grouping (Second ed.), reprinted in part in Schatkin, Disputed Paternity Proceedings sec. 8.04 at 8-19 (Fourth ed. 1977), concludes,
The HL A tests will, in the course of time, become the most powerful tool for the determination of paternity or non-paternity. In fact, the probability of exclusion by HL A, will be greater than the cumulative probability of all the other systems. Science has progressed to a point where ultimately in virtually every case where the accused is innocent, there will be an exclusion. And a man not excluded after complete testing will undoubtedly be the actual father of the child. (Emphasis added.)
Neither party introduced evidence of other medical tests touching the issue of plaintiff's paternity of Joshua. The Joint AMA-ABA Guidelines recommend that a total of seven tests, including HLA, be used for routine investigations where the question is whether a male is excluded as the father.[10] The Guidelines state that it is desirable to estimate the likelihood of paternity when the putative father is not excluded through serologic tests and that such estimates are admissible evidence in many foreign countries.[11] The Guidelines specifically recommend "[T]hat the National Conference of Commissioners on Uniform State Laws develop new uniform legislation or amend the `Uniform Parentage Act' and the `Uniform Blood Test Act' to (1) clarify judicial authority to order blood tests and (2) simplify the admissibility in evidence *705 of test results and the probative effect thereof, including the evidentiary value of estimations of "likelihood of paternity'."[12]
Births out of wedlock in Wisconsin rose from 1,174 in 1935 when the predecessor to sec. 885.23, Stats., was adopted, or 2.6% of total births, to 8,446 in 1978 or 12.4% of total births.[13] Paternity litigation will inevitably increase.
It may be that the restrictive approach in sec. 885.23, Stats., to medical tests for paternity should be reviewed because of medical advances and changed social conditions between 1935 and the present. We cannot, however, construe the negative use permitted by the statute to include a positive purpose which the statute forbids. Such a construction would work an amendment which may not be made by the court of appeals.
[1]
We conclude that the results of the HLA tissue typing tests are inadmissible under present Wisconsin law as evidence that plaintiff is the father of Joshua.
*706 2. Sufficiency Of Evidence Excluding HLA Test Results
The court's finding that plaintiff's paternity of Joshua was established by evidence which is "clear, satisfactory and convincing," does not rely exclusively on the results of the HLA tissue typing tests.
[2, 3]
A person claiming to be the father of a child born out of wedlock has a burden of establishing paternity "by a clear and convincing preponderance of the evidence." Sec. 806.04(3m), Stats. This burden is similar to the complainant's burden in a ch. 52, Stats., paternity action to prove "the issues involved by clear and satisfactory preponderance of the evidence." Sec. 52.355. The ch. 52 burden does not require the trier of fact to be convinced beyond a reasonable doubt. State ex rel. Kurtz v. Knutson, 5 Wis.2d 609, 612, 93 N.W.2d 348 (1958); State ex rel. Brajdic v. Seber, 53 Wis.2d 446, 448-49, 193 N.W.2d 43 (1972).
We therefore conclude that the burden imposed by sec. 806.04(3m), Stats., does not require the trial court to be convinced beyond a reasonable doubt.
[4, 5]
The findings of the trial court will be sustained on appeal unless contrary to the great weight and clear preponderance of the evidence. State ex rel. Isham v. Mullally, 15 Wis.2d 249, 255, 112 N.W.2d 701, 704 (1961). Isham involved a ch. 52, Stats., paternity proceeding and elaborated on the scope of review as follows:
[T]he finding of the trial court will not be set aside if the judicial mind could on due consideration of the evidence as a whole reasonably have reached the conclusion of the court below. Considering the evidence as a whole requires the evidence on each side to be weighed and probabilities arrayed against probabilities at least sufficiently to determine whether those on the appellant's side so manifestly outweigh those supporting the finding as to meet the great weight and clear preponderance *707 necessary to disapprove the finding complained of. There may be credible evidence to sustain the court's finding and which, if a jury verdict were involved, would end the inquiry on the appeal, but which in view of the whole evidence will not reasonably support the finding. When credible evidence exists supporting contrary propositions, it is only reasonable for the court to accept the proposition which is supported by the great weight and clear preponderance of the evidence. (Citations omitted.)
Appellants contend that if two males have had sexual intercourse with the mother of a child during the presumptive period of conception, neither male can be eliminated as the father of the child. They contend that the facts of this case come within their contention and that plaintiff therefore cannot be found to be the father of the child.
Joshua was a full term child. The presumptive period of his conception under sec. 891.395, Stats., was November 13, 1973 to January 12, 1974. Sec. 891.395. Plaintiff had intercourse with the mother during that period. She went to Spokane, Washington, December 3, 1973, to care for her invalid grandfather and returned some time after late January, 1974. One Timothy Allen, a resident of Seattle, Washington, testified on deposition in July, 1977 that during the first three weeks of December, 1973 he had intercourse with the mother three times in Spokane. He had no contact with her before or after that period. He testified that about a year and a half before the deposition was taken he happened to meet the mother's uncle for the first time in a Seattle bar where Allen was a bartender. He told the mother's uncle that he had sexual intercourse with the mother. He was subsequently contacted by the mother's family and the deposition resulted.
[6]
The trier of fact cannot disregard the testimony of a witness that is uncontradicted as to the existence of some fact or happening of some event, in the absence of something *708 in the case "which discredits the same or renders its against reasonable probabilities." Lopez v. Prestige Casualty Co., 53 Wis.2d 25, 28, 191 N.W.2d 908, 910 (1971), and cases cited. As Allen did not testify at the trial, the court did not have an opportunity to observe his demeanor. The court was not, however, required to believe Allen's testimony and impliedly rejected it. The court had a right to disbelieve the testimony of a witness whose appearance was the result of so remarkable a series of coincidences and so unusually candid a disclosure to a close relative, even in the context of a barroom confidence.
The remaining evidence for and against the paternity of plaintiff may be briefly summarized. The mother told a friend that she missed her November, 1973, menstrual period. An acquaintance of the mother testified that the mother told her that plaintiff was the father of Joshua after his birth and that the child had the plaintiff's nose. Joshua's grandmother said that she overheard her daughter tell the same witness that she hoped Joshua looked like a sailor acquaintance. Plaintiff testified that the mother at one time introduced him to another friend as the father of Joshua. That friend denied that the introduction was in those terms. Plaintiff testified that he and the mother jointly chose Joshua's first and middle name and that he sent money and clothing to Joshua and the mother when they were living away from him.
Joshua's birth certificate does not show the name of the father. Welfare applications by the mother listed two other men as Joshua's father, a palpable effort to shield the real father from prosecution.
Plaintiff's mother testified that shortly after Joshua's first Christmas when the child was with his mother in Texas and plaintiff was not with them, the mother sent a photograph of Joshua to plaintiff's mother. The photograph shows Joshua beaming from behind stacked toy *709 building blocks, each with an embossed capital letter. The stacked blocks spell out, "I love you Grandma."
[7]
The court's finding that the evidence is clear and convincing that plaintiff is the father of Joshua is not against the great weight and clear preponderance of the evidence, excluding the results of the HLA tests.
3. New Trial Not Appropriate
In view of our conclusion that the finding of the trial court is not against the great weight and clear preponderance of the evidence, excluding the results of the HLA tests, no reason exists to order a new trial.
By the Court.Judgment affirmed.
NOTES
[1] The petition is brought pursuant to sec. 806.04(3m), Stats., which provides,

If the rights of the natural father have not been terminated, any person who claims to be the natural father of a child born out of wedlock and not subsequently legitimated or adopted may, within 5 years after the date of birth of the child, petition for a declaration of paternity. The court may determine by a clear and convincing preponderance of the evidence that the person is the natural father of the child. Any further determinations affecting the natural father's rights shall be in accordance with the standards of s. 48.425.
[2] The following excerpts from Paul I. Terasaki, Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing, 16 Journal of Family Law 543, 544-45 (1977-78), are helpful because the article was written for the legal profession:

Most people are "rare" types because only about one out of a thousand people will have a similar HLA type. Consequently, this relatively rare type can be looked for in the child of any given mating. If the child has the same rare type as the putative father, the man is likely to be the actual biological father. On the other hand, if the putative father is wrongly accused, he can usually be excluded because the child would have inherited a different rare type from the actual father.
. . . .
The term [HLA] refers to a genetic region on the chromosome that plays a dominant role in the survival of grafted tissue. The letter H stands for human, L for leukocyte (white blood cells), and A for antigen. An antigen is any substance which can stimulate antibody production when introduced into another individual. Antigens are produced under genetic control by genes. The position of a gene on the chromosome is called a locus (plural: loci). In this study, two loci of the HLA region, the A and B loci, were used to evaluate paternity. At each locus a person possesses two genetic expressions for antigens, or two alleles. An allele represents an alternative form of a gene occupying the same locus on paired chromosomes. Any test that detects antigens by using antisera (antibodies) is called a serologic test. The summary of the identifiable antigens at the cell surface is the person's phenotype. The genetic basis for the phenotype is deduced from inheritance patterns among the offspring of a family, and is called the genotype. The haplotype is the combination of one A locus allele and one B locus allele occurring on the same chromosome, which is transmitted between generations as a packet. (Emphasis in original).
Dr. Terasaki is an authority on histocompatibility immunology and a recipient of the Philip Levine Award of the American Society of Clinical Pathology. He has made outstanding contributions to the field of blood grouping immunology. 16 Journal of Family Law 543 (footnote). He is, according to Dr. Bach, an expert in the field of HLA.
[3] According to the Legislative Reference Bureau Library file, Dr. Philip Levine of the University of Wisconsin Department of Pathology suggested the statute. The file contains a page of possible blood groupings under the ABO system and reference to the MN system. See Mark Edward Larson, Jr., Blood Test Exclusion Procedures in Paternity Litigation: The Uniform Acts and Beyond, 13 Journal of Family Law 713 (1973-74), for the history of paternity tests.
[4] Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage, Tables 1, 2 and 3, 10 Family Law Quarterly 247, 253, 257-58 (1976). This article was approved by the American Medical Association and by the Section on Family Law, American Bar Association.
[5] Ibid. at 252.
[6] Ibid., Table 1, at 255.
[7] Ibid., Tables 2 and 3, at 257-58.
[8] Terasaki, supra footnote 2, at 552-54.
[9] Ibid. at 555.
[10] Guidelines, supra footnote 4, at 257.
[11] Ibid. at 260.
[12] Ibid. at 283.
[13] Wisconsin's rate of out of wedlock births is considerably less than the national rate. In 1935 there were 78,874 out of wedlock births, or 4.1% of total live births, for the nation as a whole. In 1977, the latest year for which complete data is available, there were 7,946 such births in Wisconsin and 515,700 for the entire country, or 11.6% and 15.5% respectively of total live births. Department of Commerce, Bureau of the Census, Birth, Stillbirth, and Infant Mortality Statistics for the Continental United States, the Territory of Hawaii, the Virgin Islands 1935, Twenty-First Annual Report, Tables P and Q at 11; National Center for Health Statistics, Final Natality Statistics, 1977, DHEW Publication No. (PHS) 79-1120, vol. 27, no. 11, supplement, February 5, 1979. The 1978 Wisconsin statistics are from provisional data provided by the Wisconsin Department of Health and Social Services, Bureau of Health Statistics, Division of Health.