662 P.2d 538

Billie Lou CRAIN, Plaintiff-Appellant,

v.

Gary Dean CRAIN,
Defendant-Respondent.

No. 14054.

Supreme Court of Idaho.

April 25, 1983.

J.D. Hancock, Rexburg, for appellant.

Gary Dean Crain, pro se.

BISTLINE, Justice.

Appellant, Billie Lou Crain, married Doug Stephenson on November 16, 1974. The couple separated in February of 1975 and Billie Lou went to Salt Lake City to live with her parents. She testified that as of February 1975 she ceased having sexual relations with Doug.

Billie Lou returned to Rexburg in April of 1975 and moved into a mobile home, where she lived with her sister. Doug visited her there several times, and on occasion stayed the night. Billie Lou testified that she did not have sexual intercourse with Doug during these visits, and her sister testified that Doug and Billie Lou slept in separate rooms when he visited.

During the week of May 9–16, 1975, Billie Lou and respondent Gary Crain engaged in sexual intercourse while attending an Army Reserve training session. Later Gary moved into Billie Lou's mobile home, and in June of 1975 Billie Lou told Gary that she was pregnant.

Rebecca was born to Billie Lou on February 3, 1976. Billie Lou and Gary were then living together, but Billie Lou was still married to Doug. Gary supported Rebecca, referred to and treated her as his child, and claimed her as a dependent on his income tax returns.

Billie Lou was granted a divorce from Doug in August of 1976. In that action Billie Lou and Doug stipulated that Doug was presumptively the father of Rebecca, but that he was not her natural father.[1]

Billie Lou and Gary were married in September of 1976; they lived together until they were permanently separated in July of 1978. A child, Toby, was born of this marriage, and Gary acknowledged this child as being his.

On July 7, 1978, Billie Lou instigated divorce proceedings against Gary, therein seeking child support for her two children, Toby and Rebecca. Gary denied paternity of Rebecca and at the divorce trial that issue was submitted to the court.

Prior to trial, Billie Lou had moved the trial court for an *in limine* ruling on the admissibility of Human Leucocyte Antigene (HLA) tissue typing tests for establishing paternity. The trial court ruled that it would exclude the HLA test results on the grounds that Idaho statutes and case law allow the admission of such tests only when the results *exclude* paternity. In its written memorandum order denying the admission of the HLA test results, the court stated:

> "A motion is before the court requesting a ruling from the court that results of HLA testing for blood type may be admitted although the results of such testing will not show that the party is not the father.
>
> "It appears that modern HLA testing has become quite sophisticated and that the testing can limit to a small minority the number of people who could be the father of the child. A person tested who could be the father of that child therefore becomes one of that small minority and the likelihood of his being the father is quite high. However, it is not conclusive because even under such testing the possibility remains that another member of that minority might have been around at time of conception.

> "In California it appears that the courts are about ready to admit such evidence in their cases to establish paternity. In Idaho our courts have not gone that far. Our Idaho statutes do not permit it and our Idaho decisions interpreting those statutes rule against its admission. I believe that there would not be anything particularly wrong with considering such tests along with other evidence in establishing paternity except that the chances of his being the father are usually rated so high that I am afraid such evidence would appear to be more conclusive than it actually is.

> "It is therefore the ruling of this court that under the law as it now exists HLA testing which tends to establish paternity is not admissible. Perhaps what should have been done is to have tested other parties who might have been the father and see if they could not have been excluded. Such exclusions of other parties would have accomplished more in indicating the probability of paternity in this case than would the testing of the purported father."

R. 52–53.

At trial, an offer of proof was made by Billie Lou's attorney, who argued that her witnesses would have testified, based upon the HLA test results, that "Mr. Crain cannot be excluded as the father of that child and that the probability of his being the father is 98.98 percent and the odds are 140,000 to 1 that some other person in the male white population could be the father of Rebecca Crain other than Gary Dean Crain." Opposing counsel then argued that such tests can only be admitted into evidence if they show nonpaternity, and the trial court agreed, again meticulously detailing its reasoning:

> "Well, I understand that that is the rule in the State of Idaho and that is the rule in most states, I believe. A few states, and California is among them, are apparently relaxing that rule, although it is not

1. At the divorce trial in this case Billie Lou offered to testify that Doug had a blood test taken and that the test results demonstrated that Doug could not have been Rebecca's father, but the testimony was excluded as hearsay.

sure what California has done. The last case that has been submitted to me, and Mr. Hancock [Billie Lou's attorney] has submitted several, the official announcement by the Supreme Court of the State of California, as nearly as I can remember, was not a ruling on whether or not the test could be permitted. It was simply a ruling on whether or not the Court had a right to order the test or how the test should be ordered or something to that effect and it didn't say, I don't believe—in fact if it did say it would be dicta about its admission in the trial of the case. Now, we have some appellate court cases that appear to have admitted the test to be considered along with other evidence in determining paternity, but they in that case say that it is not conclusive and that it should be very carefully done because testimony should be taken and it should be shown just how it applies and what the rules are and so on and, as nearly as I can understand, the objection is that it might be considered to be conclusive and it is not conclusive. In other words I am sure that Mr. Hancock, if he presented it, would like to say, "Now, that proves he is the father," and, of course, it doesn't. Even going along with Mr. Hancock and say the doctors have gotten so sophisticated that they can pin it down to 98.9 percent. Let's say that we agree they can do that. There is still that possibility. I believe he said 1 in 140,000, something like that and, of course, in the United States there are several million people, I think 160,000,000 or 170,000,000, something like that. *So, there are a lot of 140,000 people in this country and even if there is only 1 in every 140,000 over the United States there could be several thousand of them and it is just possible that two or three of them could be right here in Rexburg* and that is a possibility and that is why the Courts won't admit that kind of test because they say it is not conclusive and it is quite possible that the Court would rely on it too much and that is why I refuse to accept it because I think that its mere evidence in the case might tend to sway

my opinion more than I should let it. So, I don't even want to consider it along with the other evidence. I am going to deny it and I am going to reject the offer of proof."
Tr., pp. 65–67.

The trial court by memorandum decision held that there was insufficient evidence to overcome the presumption that Doug was Rebecca's father and that Billie Lou had failed to establish that Gary was Rebecca's natural father. Billie Lou appeals that determination.

I.

The HLA test is a tissue typing test which was developed as a means of reducing the incidence of rejection of organ transplants. The test is generally performed on white blood cells, but may be done with other body tissues.

"[T]he HLA test ... is based on the identification and typing of antigen markers found in white blood cells and other tissues of the body.... The basic theory is that by identifying the antigen markers of a child and of the mother, the child's antigen genetic markers which could only be inherited from the father can generally be determined, thereby identifying the father to a high degree of certainty."

*Phillips v. Jackson,* 615 P.2d 1228, 1230–31 (Utah 1980) (footnote omitted).

For a thorough discussion of the HLA test *see* Terasaki, *Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing,* 16 J.Fam.L. 543 (1977–78) (hereinafter *Terasaki*).

The HLA test results in this case allegedly demonstrate that the probability of Gary being the natural father of Rebecca is 98.98 percent. Without doubt, this evidence is both relevant and material to the issue of paternity. However, the trial court excluded the test results primarily on the grounds that the "Idaho statutes do not permit it and our Idaho decisions interpreting those statutes rule against its admission." The trial court was referring to the case of

*Isaacson v. Obendorf,* 99 Idaho 304, 581 P.2d 350 (1978), and to the Idaho Paternity Act, particularly former I.C. § 7–1115,[2] discussed *infra* in connection with *Isaacson.*

In *Isaacson,* the trial court admitted into evidence blood grouping test results which did not exclude paternity. The blood tests had been administered to the parties and the involved child in that case at the request of the alleged father and they were not ordered by the trial court pursuant to I.C. § 7–1115. The written report of the results was admitted without any accompanying testimony by the expert who performed the tests. This Court on appeal said:

"The appellant's second assignment of error challenges the admission in evidence of blood test reports which did not exclude the paternity of the appellant and which were admitted without any accompanying expert testimony.

"The blood tests were administered to the parties at the request of the appellant and were not ordered by the trial court pursuant to I.C. § 7–1115. However, I.C. § 7–1115 is persuasive as to the allowable evidentiary uses of blood test results in paternity actions, and clearly contemplates only the admission in evidence of blood test results which exclude paternity. I.C. § 7–1115 provides: 'The Court, on motion of either party, may order the mother, her child and the defendant to submit to one or more blood tests to determine *whether or not the defendant can be excluded as being father of the child....*' (emphasis added) The weight of authority, consistent with the above discussed statute, is that evidence of blood grouping test results excluding paternity is admissible, and that evidence of results failing to establish nonpaternity is inadmissible. 10 Am.Jur.2d Bastards § 118 (1963); Clark, Domestic Relations § 5.3 (1968); McCormick on Evidence § 211 (E. Cleary ed. 1972). *See also* Annot., 46 A.L.R.2d 1000 (1956).

"Respondent argues that the case of *Comish v. Smith,* 97 Idaho 89, 540 P.2d 274 (1975), supports the proposition that blood test results which do not exclude paternity are admissible in evidence. In *Comish,* this Court did not address the issue of the allowable evidentiary uses of blood tests in paternity actions, thus respondent's reliance on *Comish* is misplaced.

"The evidentiary use of blood test results in paternity actions should be limited to those that exclude paternity. The trial court erred, albeit harmless error, in admitting in evidence blood test results which did not exclude paternity.

"The trial court also erred in admitting into evidence, over proper objection by the appellant, the blood test results with-

2. The trial court relied on former I.C. § 7–1115, 1969 Idaho Sess.Laws ch. 93, § 14, p. 322, which was then applicable. The sections of the Paternity Act relating to blood tests, I.C. §§ 7–1115 and –1116, have since been repealed and replaced. 1982 Idaho Sess.Laws ch. 127, §§ 1 and 2, p. 364, I.C. §§ 7–1115 and –1116, as amended, are appendicized. The statutory law has been substantially changed, as was forecast by footnote 1 to our opinion in *Isaacson v. Obendorf,* 99 Idaho 304, 309 n. 1, 581 P.2d 350, 355 n. 1 (1978)—which noted:

"It should be noted that some states have enacted legislation which allows for the introduction in evidence of blood test results which do not exclude paternity. Nine states have enacted the Uniform Act on Blood Tests to Determine Paternity, which was approved by the National Conference of Commissioners on Uniform State Laws and the ABA in 1952. Section 4 of the Act, in addition to allowing evidence of exclusion, permits intro-

duction of blood test evidence for possible paternity if the court in its discretion feels the blood factor is rare enough to be admitted as possible proof of paternity. Under the Uniform Parentage Act, enacted by five states and adopted by the National Conference of Commissioners on Uniform State Laws and the ABA, evidence relating to paternity may include blood test results, weighed in accordance with the evidence, of the statistical probability of the alleged father's paternity. A joint committee of the ABA section on Family Law and the American Medical Association recently recommended that the National Conference of Commissioners on Uniform State Laws develop new legislation or amend existing acts to simplify the admissibility in evidence of test results and probative effect thereof, including the evidentiary value of estimations of 'likelihood of paternity.'"

out requiring the accompanying testimony of the expert who conducted the tests. It is clear that the report in question was being used for the purpose of proving the truth of the matter asserted therein, and as such was inadmissible hearsay."

99 Idaho at 308–09, 581 P.2d at 354–55 (footnote omitted).

A review of *Isaacson* establishes that the main holding on the use of the report was its inadmissibility as hearsay. The Court did say, relative to I.C. § 7–1115 as it read then and as it applies to this case also, that the statute was "persuasive as to the allowable evidentiary uses of *blood* test results in paternity actions." *Id.* at 308, 581 P.2d at 354. However, the primary issue on appeal in this case is whether HLA *tissue* test results can be admitted as evidence tending to prove parentage in a paternity proceeding.

A thorough review of the *Isaacson* case reveals that the Court was referring only to blood grouping tests in its determination of the allowable evidentiary uses of blood test results. These were the tests at issue in *Isaacson,* and the Court in its reasoning expressly referred to blood grouping tests. 99 Idaho at 309, 581 P.2d at 355. In addition, the authorities upon which the Court relied discuss blood grouping tests.[3] Thus, we conclude that the decision in *Isaacson* as to the allowable evidentiary uses of blood test results does not preclude admission of HLA test results as affirmative proof on the issue of paternity. Furthermore, the reasoning in *Isaacson* should not be *ipso facto* extended to preclude the admission into evidence of HLA test results which do not exclude paternity.

Blood grouping tests involve a limited number of variables and are generally recognized as being accurate only in excluding paternity. *See generally Terasaki, supra* at 543–44; McCormick on Evidence § 211 (E. Cleary ed. 1972). The reason for the limitation on the use of blood grouping test results is that even though a putative father is not excluded, "his chances of actually being the father are not usually high." *Terasaki, supra* at 543. Under the circumstances, the general limitation on the use of blood grouping test results appears to be a consequence of concern over the possibility that an inference of paternity might be drawn improperly from the failure of a man to be excluded from paternity. The language in *Isaacson* reflected what we then believed to be the legislature's judgment, i.e., that the prejudice which could result from the admission of blood grouping test results not excluding paternity outweighs whatever probative value such test results would have as affirmative proof of paternity. *Cf. Goodrich v. Norman,* 100 Misc.2d 33, 421 N.Y.S.2d 285 (Fam.Ct.1979); *Ahmad v. Ahmad,* 8 Fam.L.R. 2360 (D.C.Super.1982).

The same rationale, however, is not applicable to HLA tests which "can frequently prove identity between defendant and father with a probability exceeding 98 percent, in addition to proving exclusion in numerous cases in which the A–B–O test would produce inconclusive results." *Miller v. Smith,* 6 Fam.L.R. 2660, 2662 (Ill.Cir.Ct. 1980).

"At the time that this statute was enacted the standard blood grouping tests that were universally accepted were performed only on red blood cells. The three blood group systems, ABO, MN and Rh do not constitute opinion evidence if there is a report of exclusion. The exclusion is a scientific fact of nature which can be demonstrated in the courtroom if necessary as the results of the test are visible under a microscope.... Therefore, in respect to both statutory and case law, an exclusion is deemed to be conclusive on the issue of paternity in all cases where the test has been properly administered. However, red blood cell testing involves only a limited number of variables. While the tests can prove that the petitioner herein is not the father of the child, they cannot prove that *he* is the

---

**3.** At the time *Isaacson* was decided, no appellate decisions on the admissibility of HLA tests had been handed down. The first such decision, *Cramer v. Morrison,* 88 Cal.App.3d 873, 153 Cal.Rptr. 865 (Cal.App.1979), was not released until January 16, 1979.

father. A man who has been incorrectly named has only a 50–60% chance of being excluded conclusively, depending upon his blood type. Therefore, relying on the standard tests alone would not assuage the doubts of the petitioner unless he was definitely excluded.

"The HLA test is based on tissue typing of the white blood cells. This test is far more comprehensive because it involves a larger number of factors such as antigens in the white blood cells. It is widely accepted in scientific communities because in cases involving organ transplants it is used to match the donor and the recipient. Accuracy is essential when dealing with the lives of patients. The HLA test is far more expensive than the standard blood grouping tests and has not been used routinely by the courts in New York. However, the possibility of this respondent being excluded if he has been incorrectly named is somewhat better than 90%."

*Goodrich v. Norman,* 100 Misc.2d 33, 421 N.Y.S.2d 285, 287 (N.Y.Fam.Ct.1979) (emphasis in original) (citations omitted).

The blood tests in this case were ordered by the trial court pursuant to I.R.C.P. 35(a),[4] and without mention of former I.C. § 7–1115. However, as in *Isaacson,* we will look to this statute and related statutes to determine whether the legislature has expressed an intent that HLA test results should not be admitted except to exclude paternity.

In 1969, when Idaho's Paternity Act was enacted, it appears that HLA tests were not used in paternity proceedings. *See Terasaki, supra* at 544. In fact, as late as 1975, the standard tests in paternity proceedings were the Landsteiner blood grouping tests. *See Cramer v. Morrison,* 88 Cal.App.3d 873, 153 Cal.Rptr. 865, 871 (Cal.App.1979); *see also* Lee, *Current Status of Paternity Test-*

*ing,* 9 Fam.L.Q. 615, 624 (1975); Polesky & Krause, *Blood Typing in Disputed Paternity Cases—Capabilities of American Laboratories,* 10 Fam.L.Q. 287, 291 (1976). Under the circumstances, it would be illogical to conclude that by enacting former I.C. § 7–1115, the legislature expressed an intent to bar the use of evidence obtainable through scientific techniques not then known to it. *See Happel v. Mecklenburger,* 101 Ill.App.3d 107, 56 Ill.Dec. 569, 579, 427 N.E.2d 974, 984 (Ill.App.1981) (Romiti, J., dissenting). This conclusion is particularly true in light of the fact that our legislature recently acted to expressly provide for the admission of evidence of the statistical probability of paternity (which evidence is the result of HLA tests) by the adoption of I.C. §§ 7–1115 and –1116, (appendicized hereto). *Cf. Murphey v. Murphey,* 103 Idaho 720, 725, 653 P.2d 441, 446 (1982). Furthermore, the language of the Paternity Act itself demonstrates that the legislature was only referring to blood grouping tests. Former I.C. § 7–1116, which provides for experts to be appointed by the court requires such experts to be qualified as examiners of "blood types."[5] The terminology employed—"blood types"—"is that commonly applied to the Landsteiner series of red cell blood grouping tests." *Cramer, supra,* 153 Cal.Rptr. at 869.

The problem sought to be remedied by the Paternity Act is that of illegitimacy. A decision to limit the use of HLA test results to those cases in which paternity is excluded would be inconsistent with one of the primary purposes of the Paternity Act—to insure that reliable medical evidence be made available to determine the issue of paternity. Despite the proven reliability of blood grouping tests in excluding paternity, some courts had refused to accept test results excluding paternity as being conclusive on the issue of paternity, allowing the

4. I.R.C.P. 35(a) provides in relevant part that "[w]hen the mental or physical condition (including the blood group) of a party ... is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician ...."

5. Compare former I.C. § 7–1116 with the current version of the statute, which requires experts to be "qualified as an examiner of genetic markers present on blood cells and components ...." I.C. § 7–1116.

jury to weigh test results along with other evidence. As a result, there were cases in which a man who had been scientifically excluded by test results was found to the father of a child. For the most famous of such cases *see Berry v. Chaplin,* 74 Cal. App.2d 652, 169 P.2d 442 (Cal.App.1946). We prefer to believe that the Idaho Paternity Act was enacted, in part, to avoid such a result. *See* I.C. § 7–1118 (providing that "[i]f the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, are that the defendant is not the father of the child, the question of paternity shall be resolved accordingly . . . ." This section remains in its original form, as enacted in 1969 Idaho Sess. Laws ch. 93, § 17, p. 318.). *See also* Comment, *The Legal Implications of HLA Testing for Paternity,* 16 J.Fam.L. 537, 538 n. 8 (1977–78) (an introduction to *Terasaki, supra*) (noting that the Uniform Act on Blood Tests to Determine Paternity, 9 U.L.A., § 4, 382 (Supp.1974–76), which sets out procedures for ordering blood tests, selecting experts, and giving effect to the test results, was drafted in response to unscientific decisions such as *Chaplin, supra*). As the court in *J.H. v. M.H.,* 177 N.J.Super. 436, 426 A.2d 1073, 1076 (N.J.Super.1980), noted:

"Recognizing that [the statute] made existing scientific blood testing available as an aid to evidential proof in paternity actions, it would be anomalous to conclude that the legislature thereby intended to limit litigants and the courts of this state from the benefits of future scientific tests developed after the passage of that act . . . ."

Several courts in other jurisdictions have considered the issue before us. Those cases which hold HLA tests are not blood tests within the contemplation of the statutes and, therefore, admit HLA test results as evidence to prove paternity, include: *Cramer v. Morrison,* 88 Cal.App.3d 873, 153 Cal. Rptr. 865 (Cal.App.1979); *Ahmad v. Ahmad,* 8 Fam.L.R. 2360 (D.C.Super.1982);

*Malvasi v. Malvasi,* 167 N.J.Super. 513, 401 A.2d 279 (N.J.Super.1979) (followed in *J.H. v. M.H.,* 177 N.J.Super. 436, 426 A.2d 1073 (N.J.Super.1980)); *Pollard v. Sell,* 7 Fam. L.R. 2548 (Ohio App.1981). In *Carlyon v. Weeks,* 387 So.2d 465 (Fla.App.1980), the court also held that HLA tests were admissible, despite a court-made rule that blood grouping tests which fail to exclude paternity were inadmissible. Cases holding that HLA test results cannot be admitted because of statutory limitation include: *Happel v. Mecklenburger,* 101 Ill.App.3d 107, 56 Ill.Dec. 569, 427 N.E.2d 974 (Ill.App.1981); *Cardenas v. Chavez,* 103 Mich.App. 646, 303 N.W.2d 3 (Mich.App.1980) (clarified in *Klein v. Franks,* 111 Mich.App. 316, 314 N.W.2d 602 (Mich.App.1981) (construing statute which had since been amended to allow courts to order parties to submit to HLA tests and to allow the test results to be admitted into evidence)); *J.B. v. A.F.,* 92 Wis.2d 696, 285 N.W.2d 880 (Wis.App.1979). However, even in cases in which test results are held inadmissible on statutory grounds, courts have recognized the relevancy and reliability of HLA tests. *See J.B. v. A.F., supra,* 285 N.W.2d at 883 (recognizing HLA tests as the most powerful tool for the determination of the issue of paternity); *Cardenas, supra,* 303 N.W.2d at 4 (recognizing the high degree of accuracy of HLA blood testing). In cases in which there has been no limiting statute, courts have unanimously approved of HLA tests as reliable and probative. *See Tice v. Richardson,* 7 Kan.App.2d 509, 644 P.2d 490 (Kan.App. 1982); *Commonwealth v. Blazo,* 10 Mass. App. 324, 406 N.E.2d 1323 (Mass.App.1980); *Phillips v. Jackson,* 615 P.2d 1228 (Utah 1980).

Our review of the above cases and recent literature on this matter shows that although HLA tests cannot conclusively establish that a man is the natural father of a child, the tests are now generally accepted in the scientific community as reliable evidence on the issue of paternity.[6] Thus, we

---

**6.** At the present time, although HLA tests can conclusively prove that a man is not the natural father of a child, the test cannot conclusive-

ly establish that a man is the natural father of a child. The trial court, in its order denying admission of the test results, faulted the HLA

decline to extend the reasoning of *Isaacson* and we hold that if the results of HLA tests are properly offered, such are admissible in evidence and should be considered, along with all other evidence, on the issue of paternity.[7]

■ Notwithstanding that the evidence which was allowed tended to establish the alleged paternity, the trial court ruled that Billie Lou had not overcome by clear and convincing evidence the rebuttable presumption that Doug was the natural father of Rebecca, and on that basis held against her. The failure of the court to consider the HLA tests might very well have changed the result, as the trial court intimated. Rejection of the HLA evidence was prejudicial; therefore, we reverse and remand for a new trial.

## II.

■ In so doing, pursuant to I.C. § 1–205, we consider another of Billie Lou's assignments of error: that the trial court erred in admitting testimony as to Billie Lou's reputation as a sexual libertine. This question is controlled by the case of *Comish v. Smith,* 97 Idaho 89, 92, 540 P.2d 274, 277 (1975), in which this Court specifically stated that a mother's reputation as a sexual libertine is inadmissible unless it "relates primarily to the issues of time of access and paternity of the child." *Id.* The testimony in question was general in nature and it therefore should not have been admitted

over Billie Lou's objection. On retrial such testimony should be excluded unless a proper foundation is established.[8]

*Reversed and remanded.* Costs to appellant.

DONALDSON, C.J., BAKES, J., and McFADDEN, J. Pro Tem., concur.

## APPENDIX

I.C. § 7–1115 now provides:

"Testimony and evidence relating to paternity.—Evidence relating to paternity, whether given at the trial or the pretrial hearing, may include, but is not limited to:

"(1) Evidence of sexual intercourse between the mother and alleged father at any possible time of conception;

"(2) An expert's opinion concerning the statistical probability of the alleged father's paternity based upon the duration of the mother's pregnancy;

"(3) Blood test results under section 7–1116, Idaho Code;

"(4) The statistical probability of the alleged father's paternity based upon the blood tests; or

"(5) *Medical, scientific or genetic evidence relating to the alleged father's paternity* of the child based on tests performed by experts." (Emphasis added.)

I.C. § 7–1116 now provides:

"Blood tests.—(1) The court may, and upon request of a party shall, require the

tests for not being conclusive. However, there is no requirement that the admissibility of scientific test evidence be based upon a 100 percent degree of accuracy. *See Cramer, supra; Phillips, supra.*

7. We note that our decision in this case most fully effectuates the interests of all parties concerned—mother, father, child and public. The mother has an obvious interest in establishing the paternity of her child and in so doing, being able to seek support for it. Similarly, a child has an interest and a need to know his true parentage. *See J.H. v. M.H.,* 177 N.J.Super. 436, 426 A.2d 1073, 1075 (N.J.Super.1980). In addition, there is a general public interest in establishing a child's paternity, as well as a financial interest in doing so. A child without a known father may in some cases, such as this one, receive public assistance in lieu of paternal

support. *See In re Jane L.,* 7 Fam.L.R. 2474, 2475 (N.Y.Fam.Ct.1981). Finally, as noted recently by a comentator, "[HLA] tests could also be employed in a novel fashion aiding men who seek to establish paternity in order to obtain custody or visitation rights." Mendelson, *From Here to Paternity,* 9 Barrister Winter 1982, at 12, 15.

8. Billie Lou also argues that the trial court's finding of fact that Billie Lou and Doug stipulated that Gary would not be held liable as Rebecca's father is not supported by substantial competent evidence. We agree, but believe that the error was unintentional. The record establishes that the stipulation was that Doug would not be held liable as the father of Rebecca.

child, mother, alleged father, or any male witness who testifies or will testify about his sexual relations with the mother at a possible time of conception to submit to blood tests. *The tests shall be performed by an expert qualified as an examiner of genetic markers present on blood cells* and components, appointed by the court. Verified documentation of the chain of custody of the blood is competent evidence to establish chain of custody. Verified experts' report shall be admitted at trial unless a challenge to the testing procedures or the blood analysis has been made twenty (20) days before trial.

"(2) The court, upon reasonable request by a party, shall order that *independent tests be performed by other experts qualified as examiners of genetic markers* present on blood cells and components. Additional tests performed by other experts of the same qualifications may be ordered by the court at the expense of the party requesting additional testing.

"(3) In all cases, the court shall determine the number and qualifications of the experts.

"(4) The requesting party shall pay the expense of blood testing; however, the cost of blood testing shall be recovered by the prevailing party in the action.

"(5) Whenever the results of the tests exclude any male witness from possible paternity, the tests shall be conclusive evidence of nonpaternity of the male witness. The refusal of any party to submit to the blood tests shall be disclosed to the court and is subject to the sanctions within the jurisdiction of the court. If the action was brought by the child's mother, but she refuses to submit herself or the child to blood tests, the action shall be dismissed.

"(6) Any party calling a male witness for the purpose of testifying that he had sexual intercourse with the mother at any possible time of conception shall provide all other parties with the name and address of the witness twenty (20) days before the trial or pretrial hearing. If a male witness is produced at the hearing for the purpose stated in this subsection, but the party calling the witness failed to provide the twenty (20) day notice, the court may adjourn the proceeding for the purpose of taking a blood test of the witness prior to hearing the testimony of the witness if the court finds that the party calling the witness acted in good faith." (Emphasis added.)

SHEPARD, Justice, dissenting.

It is my belief that the trial court and this Court in the majority opinion have totally overlooked substantial problems that are inherent in this cause. The ultimate end of these proceedings is to bastardize a seven-year old child, a result with which I cannot concur regardless of the protestations of and quarrels between a mother, her ex-husband, who is the presumptive father of the child, and an interloper whom the mother claims as the father of the child because he slept with her during the course of her marriage to the first husband.

Appellant mother was married to one Stephenson on November 16, 1974, and that marriage was not terminated by divorce until August of 1976. The child, which is the focus of this action, was born February 3, 1976. Admittedly, that child was conceived and born during the Stephenson marriage. Until 1970, the clear law in Idaho was that a child conceived *or* born during the time of a marriage was well nigh irrebuttably presumed to be the child of that husband. In *Alber v. Alber,* 93 Idaho 755, 472 P.2d 321 (1970), the then existing law was modified to provide that the theretofore existing presumption "is not conclusive but may be rebutted by clear and convincing evidence." In *Alber,* the ultimate question ordered to be addressed by the trial court on remand was:

"a specific finding of fact based on the evidence heretofore adduced regarding whether the appellant had access for the purpose of sexual intercourse with his then wife following their separation in November, 1966, and during the possible period of conception. Following the entry of such finding of fact, the trial court

is further instructed to enter his conclusion of law stating whether or not the presumption of the legitimacy of the child conceived during the marital period has been overcome by clear and convincing evidence." *Id.,* 93 Idaho at 761, 472 P.2d at 327.

In the instant case, those questions have not been addressed. In my view, the trial court rather proceeded on the bland assumption that Stephenson was not the father of the child and the only question was whether Crain was the father of the child. Such a result, of course, leaves the child floating in limbo, a result I cannot countenance.

If the issue in the instant case was the paternity of a child born to an unwed mother, the majority's discussion of *Comish v. Smith,* 97 Idaho 89, 540 P.2d 274 (1975), and *Isaacson v. Obendorf,* 99 Idaho 304, 581 P.2d 350 (1978), would clearly be relevant, since in both *Comish* and *Isaacson,* unwed mothers had brought paternity proceedings under the provisions of Idaho's Paternity Act, I.C. § 7–1101, *et seq,* to require that person, named by the mother and found by the court to be the father of the child, to support the child. If the facts of the case at bar bore any resemblance to either *Comish* or *Isaacson,* I would instantly concur and applaud the majority for allowing our trial court to utilize the technological advances in medicine, specifically the HLA test, to further the cause of justice in paternity proceedings. We are not, however, presented with such a set of facts.

In the instant case, as in *Alber,* a wife, during the course of a marriage, had extramarital relations with another man. A child was conceived. As in *Alber,* in the instant case it is unclear to me at least, and the trial court made no finding, whether the then husband had sexual access to his wife during the time of the conception of the child. During the divorce proceedings, in *Alber,* as in the instant case, the mother took the stance that her husband whom she was divorcing was not the father of the child. It was held in *Alber* that the doctrines of estoppel by judgment and res judicata "do not apply to a case of this nature where the specific issue drawn in question is that of child support. Child support is for the benefit of the children . . . [and] she [the mother] is not the real person in interest who can *waive the rights of the child.*" (Emphasis supplied.) *Id.,* 93 Idaho at 758, 472 P.2d at 324. The *Alber* result was reached notwithstanding that the mother had communicated, both orally and in writing, to everyone who would listen to her that her husband was not the father of the child and that another specifically named individual was the father of her child.

Much of today's majority opinion is hinged upon the interpretation of Idaho's Paternity Act, I.C. § 7–1101, *et seq.* Contrary to the utilization of that Act by the majority opinion, I would hold that the clear legislative intent, as disclosed by the definitions contained in § 7–1103, is that the Act should apply only to proceedings brought to establish the paternity of a child born out of wedlock. That statute specifically defines "child" as a "child born out of wedlock." It defines "mother" as "the mother of a child born out of wedlock."

In sum, I feel the Court embarks upon a dangerous voyage today. It is clear that Crain, regardless of his previous conduct, now cares little or nothing about the child, which milk of human kindness is equally shared by Stephenson. The mother also did not hesitate to abandon any rights the child might have to the name or the support of her presumptive father but appears to have been primarily interested in clearing the way for a permanent relationship with her erstwhile lover. It also appears that the "interests" of the child became paramount in her mind when love flew out the window, her second marriage terminated, and she found that the rights of the child she had so readily abandoned in the first divorce could only be recouped by way of child support from her second husband. I find it difficult to choose between the various alternatives. Does one excuse Crain from supporting a child which the testimony indicates he very probably fathered, because of the fortuitous circumstances that his copulation partner

was at that time married? Does one excuse Stephenson from his otherwise paternal duties because the child born during his marriage was undoubtedly the result of adulterous relationship between then Mrs. Stephenson and Crain? Does one reward the mother of the child for her sterling qualities and her actions on behalf of the child? The inclination would be to say, "A pox upon all of your houses," were it not for the existence of the child.

We stated in *Alber v. Alber, supra,* 93 Idaho at 758, 472 P.2d at 324, and reiterated in *Miller v. Miller,* 96 Idaho 10, 523 P.2d 827 (1974), "The conduct and the misrepresentations of a parent cannot militate against the interest of a child which is of paramount consideration." In *Miller, supra,* 96 Idaho at 11, 523 P.2d at 828, "[a] medical report was introduced in the record which established that the appellant was not the father of the child." Nevertheless, over the protestations of the mother of the child, its custody was awarded to the former husband of the mother.

I can readily visualize some results of today's majority decision which I for one would not perceive as advances in our jurisprudence. Among the parade of horribles, I see husbands in divorce cases disclaiming parentage of children born during the marriage and demanding that medical technology settle the issue.

I would remand the cause to the trial court for trial on the issue of Stephenson's parentage of the child. He is clearly presumptively the father of the child, regardless of the previous divorce negotiations entered into by him and his then wife. Only if the presumption is adequately rebutted by clear and convincing evidence should the trial court conclude that Stephenson is not the father of the child. Only thereafter would I hold that there is any issue as to Crain's paternity of the child and only in that phase of the trial would I conclude that there is any relevance to any evidence of Crain's parentage of the child.

Last, but not least, I would order the trial court to appoint a guardian ad litem for the child, which person should be an officer of the court and thoroughly detached from any of the other parties to the action, and hence without bias or prejudice but serving only the best interests of the child.