**Tracy L. KOFFORD and the State of Utah, by and through the Utah State Department of Social Services, Plaintiffs and Respondents,**

v.

**Donald Lane FLORA, Defendant and Appellant.**

No. 18854.

Supreme Court of Utah.

Sept. 30, 1987.

---

Ted Cannon, Salt Lake City, Sandy Mooy, Farmington, for plaintiffs and respondents.

Paul T. Morris, West Valley City, for defendant and appellant.

STEWART, Associate Chief Justice:

Donald Lane Flora [1] appeals from a judgment and decree declaring him to be the natural father of a child born to plaintiff Tracy L. Kofford and ordering him to pay $100 per month child support to her. Judgment was also rendered against Flora and in favor of the co-plaintiff, the State of Utah, in the sum of $2,000 as reimbursement for past public assistance monies paid to Tracy L. Kofford. At trial, evidence from a human leukocyte antigen (HLA) test was admitted. The issues on this appeal are whether that evidence should have been admitted and whether a clear and convincing standard of proof should be ap-

---

1. According to certain documents in the record, the putative father's name is correctly spelled "Donald Layne Flora." However, because the pleadings and briefs spell it as it appears above, we use that spelling also.

plied to the paternity issue rather than a preponderance of the evidence standard. We reverse and remand for a new trial in light of the standards we set out herein for the admission of HLA test evidence.

Kofford's child was born March 23, 1979. When Kofford applied for assistance from the State, she listed Flora as the child's father. Flora has consistently denied paternity, claiming that he did not have sexual intercourse with Kofford during the period when conception could have occurred. He admits, however, that he had sexual intercourse with her prior to that time, during her menstrual cycle.

Kofford claims Flora was her only consort during the time she could have conceived. Other witnesses testified that she and Flora had sexual intercourse during the time when conception could have occurred. Still other testimony contradicts Kofford's statement that Flora was her only consort during the critical time period.[2]

Blood and HLA tests were ordered by the trial court. Blood samples were drawn from Kofford, Flora, the child, and Kofford's mother. HLA and ABO tests were conducted and the results admitted at trial. An expert witness calculated that Flora's probability of paternity was 85 percent. To arrive at that figure, the expert assumed that Flora and one other man of the same racial or ethnic group had had sexual intercourse with Kofford during the time conception could have occurred.

The trial court found that the evidence preponderated in favor of Flora's paternity and entered judgment accordingly.

## I. GENERAL RELIABILITY OF HLA TESTS IN PROVING PATERNITY

1. *The Test To Be Applied*

*Phillips v. Jackson*, 615 P.2d 1228 (Utah 1980), held that the HLA test was inadmis-

sible because there was inadequate evidence of its reliability and that, in addition, the evidentiary foundation failed to demonstrate that it had been performed in accordance with appropriate procedures. In addressing the reliability issue, we held that new scientific evidence may be found reliable either under the general scientific acceptance test enumerated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), or under a broader test of reasonable demonstrability of reliability or "inherent reliability." *Phillips*, 615 P.2d at 1234–35. We did not then, nor need we now, decide whether the tests are coextensive. Now that we readdress the issue of the admissibility of HLA tests, we do so under the *Frye* test because of the widespread attention the reliability of the HLA test has received from courts and scholars since *Phillips*. Parenthetically, we also note that *Phillips* held that HLA test evidence would not be inadmissible under statutory law governing the admissibility of blood tests if reliability and an adequate foundation were established.

The question now arises for the first time whether the *Frye* general scientific acceptance test applied by *Phillips* has been superseded by the adoption of the Utah Rules of Evidence in 1983. The *Frye* test was first established long before the adoption of the Federal Rules of Evidence, upon which the Utah Rules of Evidence are patterned. *See Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923). In *Phillips*, we stated:

> *Frye* held that scientific tests still in the experimental stages should not be admitted in evidence, but that scientific testimony deduced from a "well-recognized scientific principle or discovery" is admissible if the scientific principle from which the deduction is made is "sufficiently established to have gained general accept-

**2.** Flora's counsel did present evidence, of greatly disparate degrees of persuasiveness, suggesting there may have been as many as nine consorts. The evidence was intended to diminish the effect of the HLA evidence. The expert witness testified that the probability of paternity would decrease substantially with each addi-

tional consort. The trial court found, in the same numerical finding in which it addressed the HLA evidence, that Flora had not convincingly shown that Kofford had had other consorts. Nevertheless, the trial court rejected a specific proposed finding that Kofford had had no other consorts.

ance in the particular field in which it belongs."

*Phillips*, 615 P.2d at 1233 (quoting *Frye*, 293 F. at 1014).

Before the adoption of the present Utah Rules of Evidence, *Phillips* recognized that the *Frye* test is suited for certain types of new scientific evidence and that the admissibility of scientific evidence is not solely dependent on meeting the *Frye* requirements, if the reliability of the scientific techniques employed in a case can otherwise be reasonably demonstrated.

Different types of scientific evidence may pose varying and sometimes difficult problems for the integrity of the factfinding process, but in an age when one scientific advancement tumbles in rapid succession upon another and may be known only among a limited circle of scientists, we are not inclined to adopt a standard that would deprive the judicial process of relevant scientific evidence simply because it is of recent vintage or because knowledge of the principles, or the process for applying a principle, is limited to a small but highly specialized group of experts.

*Phillips*, 615 P.2d at 1234.

Rule 702 of the Utah Rules of Evidence, which tracks the same federal rule, governs generally the admission of scientific evidence. Rule 702 provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Utah R.Evid. 702. Rule 703 provides further that the facts or data which form the basis of the expert's opinion need not be admissible in evidence "[i]f of a type reasonably relied upon by experts in the particular field...."

■ However the test is formulated for determining the admissibility of new scientific evidence, a foundation establishing the reliability of new scientific evidence must be established for it to be admissible.

*United States v. Downing*, 753 F.2d 1224, 1237–38 (3d Cir.1985); *Phillips*, 615 P.2d at 1234. Some federal courts have rejected the *Frye* test, at least as an exclusive test for evaluating new scientific evidence under the Federal Rules of Evidence. *See, e.g., Downing*, 753 F.2d 1224 (3d Cir.1985); *United States v. Williams*, 583 F.2d 1194 (2d Cir.1978), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979); *United States v. Baller*, 519 F.2d 463 (4th Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975). *See also State v. Williams*, 388 A.2d 500 (Me.1978); *State v. Brown*, 297 Or. 404, 687 P.2d 751 (1984); *State v. Walstad*, 119 Wis.2d 483, 351 N.W.2d 469 (1984).

Nevertheless, we think it error to suppose that *Frye* should be rejected because of those rules. A number of federal and state courts have continued to apply that standard. *See United States v. Distler*, 671 F.2d 954 (6th Cir.), *cert. denied*, 454 U.S. 827, 102 S.Ct. 118, 70 L.Ed.2d 102 (1981); *United States v. Tranowski*, 659 F.2d 750, 756 (7th Cir.1981); *United States v. Hendershot*, 614 F.2d 648 (9th Cir.1980); *United States v. McDaniel*, 538 F.2d 408 (D.C.Cir.1976). *See also People v. Shirley*, 181 Cal.Rptr. 243, 723 P.2d 1354 (Cal.1982), *cert. denied*, 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982); Saltzburg & K. Redden, *Federal Rules of Evidence Manual*, 452 (3rd ed. 1982).

Even some of those courts which have rejected *Frye* as an exclusive test recognize that in some instances the *Frye* test is sufficient to establish the reliability of scientific evidence. The United States Court of Appeals for the Second Circuit has written that "[a] technique unable to garner *any* support, or only miniscule support, within a scientific community, would be found unreliable by a court." *Williams*, 583 F.2d at 1198 (emphasis in original). And *Downing*, a Third Circuit case often cited as a case that rejects the *Frye* test, stated that "a technique that satisfies the *Frye* test usually will be found to be reliable as well." *Downing*, 753 F.2d at 1238.

■ We hold that *Frye* is a valid test, even though not necessarily an exclusive

test, for determining when a scientific evidence is sufficiently reliable to be admitted and is not inconsistent with Rules 402, 403, and 702 of the Utah Rules of Evidence. *See Downing,* 753 F.2d 1224. Now that the reliability of the principles of HLA testing has been demonstrated, *see infra,* judicial notice of that fact may be taken, and hereafter foundational evidence as to the validity of the basic principles may be dispensed with in this jurisdiction in the future. As we wrote in *Phillips,* "General acceptance in the scientific community ... assures the validity of the basic principle." *Phillips,* 615 P.2d at 1233.

2. *Applying the Frye Test*

█ We believe that the basic principles upon which HLA tests for determining paternity are founded have now received general acceptance in the scientific community. Since *Phillips* was handed down, all courts that have considered the validity of HLA tests for determining paternity have found that they are founded on reliable principles, and most courts have based that determination on the general acceptance in that part of the scientific community concerned with HLA testing for the purpose of proving paternity. *Moore v. McNamara,* 201 Conn. 16, 513 A.2d 660 (1986); *Cutchember v. Payne,* 466 A.2d 1240 (D.C.1983); *Carlyon v. Weeks,* 387 So.2d 465 (Fla.Dist.Ct.App. 1980); *Crain v. Crain,* 104 Idaho 666, 662 P.2d 538 (1983); *Davis v. State,* 476 N.E.2d 127 (Ind.Ct.App.1985); *State ex rel. Hausner v. Blackman,* 7 Kan.App.2d 693, 648 P.2d 249 (1982); *Tice v. Richardson,* 7 Kan.App.2d 509, 644 P.2d 490 (1982); *Perry v. Commonwealth,* 652 S.W.2d 655 (Ky. 1983); *State v. Thompson,* 503 A.2d 689 (Me.1986); *Haines v. Shanholtz,* 57 Md. App. 92, 468 A.2d 1365 (1984); *Commonwealth v. Beausoleil,* 397 Mass. 206, 490 N.E.2d 788 (1986); *Willerick v. Hanshalli,* 136 Mich.App. 484, 356 N.W.2d 36 (1984); *Imms v. Clarke,* 654 S.W.2d 281 (Mo.Ct. App.1983); *Owens v. Bell,* 6 Ohio St.3d 46, 451 N.E.2d 241 (1983); *Shipp v. State,* 713 P.2d 10 (Okla.1986); *Smith v. Shaffer,* 511 Pa. 421, 515 A.2d 527 (1986); *Turek v.*

*Hardy,* 312 Pa.Super. 158, 458 A.2d 562 (1983); *South Carolina Department of Social Services v. Bacot,* 280 S.C. 485, 313 S.E.2d 45 (S.C.Ct.App.1984); *Hankerson v. Moody,* 299 Va. 270, 329 S.E.2d 791 (1985). We are unaware of any case that holds HLA tests for paternity determinations to be inherently unreliable.

Furthermore, without exception as far as we have been able to determine, scholars agree that HLA testing is a basically reliable method of proving paternity with a high degree of probability in certain cases, if the tests are properly conducted. *See, e.g.,* American Association of Blood Banks, Committee on Parentage Testing, *Standards for Parentage Testing Laboratories* (1986); Ellman & Kaye, *Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?,* 54 N.Y.U.L.Rev. 1131 (1979) (hereinafter "Ellman & Kaye, *Probabilities and Proof*"); *Joint AMA–ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage,* 10 Fam.L.Q. 247 (1976) (hereinafter *"Joint AMA–ABA Guidelines"*); Peterson, *A Few Things You Should Know About Paternity Tests (But Were Afraid to Ask),* 22 Santa Clara L.Rev. 667 (1982) (hereinafter "Peterson, *Paternity Tests*"); Polesky & Lentz, *Parentage Testing: An Interface Between Medicine and Law,* 60 N.D.L.Rev. 727 (1984) (hereinafter "Polesky & Lentz, *Interface*"); Stroud, Bundrant, & Galindo, *Paternity Testing: A Current Approach,* 16 Trial, Sept. 1980, at 46 (hereinafter "Stroud, Bundrant & Galindo, *A Current Approach*").

## II. THE NATURE OF HLA TESTS IN THIS CASE

The issue we now address is the reliability of the HLA tests conducted in this case. The cases and literature since *Phillips* concerning the forensic use of HLA tests have advanced our understanding of the reliability and the limitations of the test generally and the specific factors that determine its reliability in a specific case.[3] We turn now

---

3. For literature since 1980 on HLA testing and its complexities, the reader is referred generally

to the following sources: Ellman & Kaye, *Probabilities and Proof: Can HLA and Blood Group*

to a discussion of those factors and the use and limitations of HLA tests in the courtroom.

When an HLA test is conducted, blood is drawn from an individual and the white blood cells are isolated. The white blood cells are then placed in as many as 180 wells in a plastic tray, each of which is filled with a different antiserum which contains specific antibodies and a special dye. In only those wells where the antigens on the white blood cells react with the antibodies in the antiserum, the cells are killed, swell in size, and are stained by the dye. If the antigens and the antibodies do not react, the cells remain viable and repel the dye. Matching the wells containing the stained cells with the antiserum in those wells indicates the antigens present on the cell, and the antigens in turn indicate the specific HLA alleles present in the genetic material of the individual being tested. Peterson, *Paternity Tests*, 20 Santa Clara L.Rev. at 673–74; Stroud, Bundrant & Galindo, *A Current Approach*, 16 Trial, Sept. 1980, at 47.

Most cells in the human body contain twenty-three pairs of chromosomes, with one chromosome of each pair inherited from the mother and one inherited from the father. Several points, called loci, have been identified along each chromosome. These loci mark specific locations on the chromosome where certain genes are found. At a certain locus on each chromosome of a specific pair of chromosomes is the gene which is expressed as HLA type A. On the same chromosome at a different locus is the gene for HLA type B. The

individual genes are known as alleles. A number of HLA A and B alleles naturally occur, and they are identified by specific numerical designations, *e.g.*, A1, A2, A28, B5, B14, B35, etc. The loci for the A and B alleles are so close together that 99 percent of the time the specific A–B combination, called a haplotype, which appears on an individual chromosome is passed as a unit to the offspring. Each child normally receives one haplotype from its mother and one from its father.

In this case, HLA testing established that Kofford has HLA alleles A2, A3, B39, and B60. The child has HLA alleles A2, A3, B7, and B60. The maternal grandmother has HLA alleles A2, A24, B7, and B60. Flora has at least HLA alleles A3 and B7.[4] Comparing the maternal grandmother's alleles with Kofford's, it was determined that a near certain chance exists that Kofford has A2–B60 and A3–B39 haplotypes. If this is true, a similar chance exists that Kofford transmitted the A2–B60 haplotype to the child. The A3 and B7 alleles would then have had to come from the father combined as the other haplotype. Since Flora has both the A3 and B7 alleles, he cannot be excluded as a possible father. The tests as conducted, however, did not reveal whether Flora has the A3 and B7 alleles combined as a haplotype, because neither of Flora's parents was tested.

Knowing that the putative father has the necessary alleles does not end the inquiry. It must then be determined what percent of the male population of the same racial or ethnic group carries the same alleles.[5]

*Testing Prove Paternity?*, 54 N.Y.U.L.Rev. 1131 (1979); Peterson, *A Few Things You Should Know About Paternity Tests (But Were Afraid to Ask)*, 22 Santa Clara L.Rev. 667 (1982); Polesky & Lentz, *Parentage Testing: An Interface Between Medicine and Law*, 60 N.D.L.Rev. 727 (1984); Stroud, Bundrant & Galindo, *Paternity Testing: A Current Approach*, 16 Trial, Sept. 1980, at 46; Terasaki, *Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing*, 16 J.Fam.L. 543 (1977–78); Comment, *Paternity Testing With the Human Leukocyte Antigen System: A Medicolegal Breakthrough*, 20 Santa Clara L.Rev. 511 (1980); Comment, *Blood Test Evidence in Disputed Paternity Cases: Unjustified Adherence to the Exclusionary Rule*, 59 Wash.U.L.Q. 977 (1981); Note, *Cutchember v.*

*Payne: Approaching Perfection in Paternity Testing*, 34 Cath.U.L.Rev. 227 (1984).

4. Due to an error in the transcription of the testimony, it is impossible to determine exactly what Flora's other alleles are. However, since the child had to receive A3 and B7 from its father, and it is clear from the record that Flora has both of these, it is unnecessary for us to know the identity of his other alleles.

5. Dividing the male population along racial and ethnic lines is necessary because the alleles appear with differing frequencies in different racial and ethnic groups. *See generally* articles cited in footnote 3. *See also Phillips v. Jackson*, 615 P.2d 1228, 1237 (Utah 1980).

Subtracting this percentage from 100 percent reveals the probability of *exclusion* of other males. Ellman & Kaye, *Probabilities and Proof,* 54 N.Y.U. L.Rev. at 1140–41; Stroud, Bundrant & Galindo, *A Current Approach,* 16 Trial, Sept. 1980, at 47. If one assumes for purposes of illustration only that 10 percent of the male caucasian population has the A3 and B7 alleles, like Flora, the probability of exclusion of other males is 90 percent.

Thus, if the putative father has the same HLA alleles as the child, the probability of exclusion calculation means only that he is not among that percentage of the relevant male population that can be excluded. The probability of exclusion calculation does not reveal the probability that a particular individual is the father. *See generally* articles cited in footnote 3. A probability of exclusion as high as 91 percent can be determined by HLA testing alone, Comment, *Blood Test Evidence In Disputed Paternity Cases: Unjustified Adherence to the Exclusionary Rule,* 59 Wash.U.L.Q. 977, 988–89 n. 80 (1981) (hereinafter "Comment, *Blood Test Evidence* "), but a higher probability of exclusion can be reached when several different blood tests are combined. *See generally* articles cited at footnote 3; *J.B. v. A.F.,* 92 Wis.2d 696, 285 N.W.2d 880, 883 (Wis.Ct.App.1979).

In this case, the expert witness testified that as many as 4.3 percent or as few as 3.4 percent of the male caucasian population have the A3–B7 *haplotype.* It is known that Flora has both the A3 and the B7 alleles, but the expert admitted he had no way of knowing whether Flora has the A3–B7 haplotype without testing one of Flora's parents.[6] Thus, the percentages presented by the expert are misleading because they do not reflect the total percentage of the relevant population that has the A3 and B7 *alleles.*

Once the probability of exclusion is obtained, a trained expert can calculate the probability of paternity using Bayes' Theorem.[7] The standard formula for determining the probability of paternity, and the one used in this case, assumes two things: (1) that the putative father had intercourse with the mother during the period when conception could have occurred, and (2) that one other man of the same racial or ethnic group also had intercourse with the mother during the same critical time. Thus, even before the results of the HLA test are applied, it is *assumed* that the putative father has a 50 percent chance of being the actual father. *See* footnote 3. Based on these assumptions, the expert calculated the probability that Flora fathered the child to be 85 percent.

## III. STANDARDS FOR ADMITTING HLA TEST EVIDENCE IN THE COURTROOM

HLA testing and the statistical interpretation of the results are complex. Unless HLA test evidence is properly produced and presented, it could easily mislead or confuse a factfinder.

The Massachusetts Supreme Judicial Court recently carefully defined standards for the use of HLA test evidence in *Commonwealth v. Beausoleil,* 397 Mass. 206, 490 N.E.2d 788 (1986). The court imposed the following five limitations on the admissibility of evidence based on HLA tests: (1) a *probability of exclusion* calculation may not be presented to the factfinder because of its tendency to mislead or confuse; (2) test results should be presented in terms of the *probability of paternity;* (3) the *probability of paternity,* if based on a 50 percent probability of paternity of the putative father in question, must be 95 percent or greater to be admissible; (4) a *probability*

**6.** Interestingly, *Joint AMA–ABA Guidelines* lists the A3–B7 haplotype as a very common haplotype, occurring in 7.6 percent of the male population, according to information available in 1976. *Joint AMA–ABA Guidelines,* 10 Fam.L.Q. at 277.

**7.** Bayes' Theorem is a formula which tells "a rational decisionmaker how newly discovered

evidence should change a prior probability that a hypothesis is true." Peterson, *Paternity Tests,* 22 Santa Clara L.Rev. at 681. As applied to HLA testing for paternity, Bayes' Theorem tells how the HLA test results affect some prior probability, usually 50 percent, that the putative father is the true father.

*of paternity* of 95 percent or greater may not be deemed conclusive on the issue of paternity (a 100 percent degree of probability is not possible); and (5) HLA test evidence must be based on a proper evidentiary foundation showing that appropriate procedures were established and routinely followed to assure reliability in the performance of the tests, chain of custody, etc. 490 N.E.2d at 795–97. We agree with these standards, except that the fact that a man is excluded may be adduced, as discussed below.

1. *The Probability of Exclusion*

A probability of exclusion statistic reveals the portion of the relevant male population that does not have the necessary alleles to be the father. This statistic allows one to infer that the putative father falls within the relatively small percentage of the male population who could have fathered the child.[8] However, "it does nothing [in the vast majority of cases] to distinguish the true father from the perhaps millions of men who fall into the group." Peterson, *Paternity Tests*, 22 Santa Clara L.Rev. at 680. A calculation of a 90 percent probability of *exclusion* does *not* mean a 90 percent probability of paternity. If there are 1,000,000 men in the relevant male population group and a 90 percent probability of exclusion, 100,000 men could be the father of the child. Thus, the probability of paternity based solely on the probability of exclusion would be one in 100,-000, or .001 percent. Ellman & Kaye, *Probabilities and Proof*, 54 N.Y.U.L.Rev. at 1141; Peterson, *Paternity Tests*, 22 Santa Clara L.Rev. at 684. Therefore, as a general proposition, "the potential for confusing and misleading the factfinder is so great that the court should exclude it under its general power to exclude evidence which creates a substantial danger of prejudice, of confusing the issues, or misleading the factfinder." *Id.* (footnotes omitted). *See also Beausoleil*, 490 N.E.2d at 795; *Davis v. State*, 476 N.E.2d 127, 137 (1985); *State ex rel. Hausner v. Black-*

*man*, 648 P.2d 249, 253 (1982); *Imms v. Clarke*, 654 S.W.2d 281, 285–86 (Mo.Ct. App.1983). Only when the probability of exclusion is in an "extreme range" should it be held admissible. *Id.* at 285.

The reason for excluding probability of exclusion statistics is forcefully illustrated by the testimony of the expert witness in this case. He testified that as many as 4.3 percent or as few as 3.4 percent of the population have the haplotype he assumed the child's father has, without, however, stating it as an assumption. (The two different figures represent two different studies of the incidence of the haplotype in the male population.) He implied that the 4.3 percent and 3.4 percent figures reflect a probability of paternity and stated that based on these figures, "[y]ou can say a ninety-six percent chance [exists] she is right when she points at him [and says he is the father]." This statement is incorrect. The figures do indicate that 96 percent of the relevant male population cannot be the father, but they do not indicate that there is a 96 percent chance that Flora is the father.

■ Although a probability of exclusion calculation cannot ordinarily be presented to a factfinder as proof of paternity, the fact that a putative father can or cannot be excluded may be presented. For example, if there are three, and only three, men who had sexual intercourse with the mother during the time she could have conceived, and HLA tests performed on all three indicate that two are positively excluded while the third is not, the test results, even absent a statistical analysis, would be highly probative, if not determinative, on the issue of paternity.

2. *Manner of Presenting the Evidence: The Probability of Paternity*

■ An HLA statistical analysis should be presented to the factfinder in terms of the probability of paternity. The probability of paternity is derived from a calculation

---

**8.** At least one court has held that a probability of exclusion calculation is not at all probative because it in no way makes the fact of paternity

more or less likely. *State ex rel. Hausner v. Blackman*, 7 Kan.App. 693, 648 P.2d 249, 253 (1982).

involving the probability of exclusion and a prior probability of paternity by application of Bayes' Theorem, which is a formula for telling a rational decision-maker how additional evidence changes an assumed probability that a hypothesis is true. Ellman & Kaye, *Probabilities and Proof,* 54 N.Y.U. L.Rev. at 1148; Peterson, *Paternity Tests,* 22 Santa Clara L.Rev. at 681. As applied to HLA test results in paternity actions, Bayes' Theorem indicates what effect the HLA test results have on an assumed probability, usually 50 percent, that the putative father is in fact the father. Ellman & Kaye, *Probabilities and Proof,* 54 N.Y.U. L.Rev. at 1148; Peterson, *Paternity Tests,* 22 Santa Clara L.Rev. at 681; Polesky & Lentz, *Interface,* 60 N.D.L.Rev. at 735.

■ In calculating the probability of a defendant's paternity in a paternity action, the calculation begins with the assumption of a 50 percent probability that the defendant is the father. It is also assumed (1) that the mother had sexual intercourse with the putative father during a time when she could have conceived the child, and (2) that the mother also had sexual intercourse with another man of the same racial or ethnic group as the putative father during the same critical time. These assumptions may not be supported by the facts of a particular case, but they are made because, at the time the tests are made and analyzed, the expert does not have access to the evidence of a particular case and does not know how disputed issues of fact should be resolved. Ellman & Kaye, *Probabilities and Proof,* 54 N.Y.U. L.Rev. at 1148–52; Peterson, *Paternity Tests,* 22 Santa Clara L.Rev. at 685; Polesky & Lentz, *Interface,* 60 N.D.L.Rev. at 735. Because of the factual assumptions made, the expert must be able to give alternative conclusions based on alternative factual assumptions suggested by the evidence in a particular case. Ellman & Kaye,

*Probabilities and Proof,* 54 N.Y.U.L.Rev. at 1150–61; Peterson, *Paternity Tests,* 22 Santa Clara L.Rev. at 686–89; Polesky & Lentz, *Interface,* 60 N.D.L.Rev. at 735. The factfinder must be carefully and completely advised concerning the assumptions underlying the conclusions and how belief or disbelief of the assumptions would affect the calculation of the probability of paternity. *The factfinder must also be informed with the greatest clarity possible that it must disregard the probability of paternity statistic if it finds that the putative father did not have sexual intercourse with the mother during the period of conception.* Evidence of the probability of paternity is invalid if there is no independent evidence establishing that the putative father had intercourse with the mother. *See Smith v. Shaffer,* 511 Pa. 421, 515 A.2d 527 (1986).[9] Other facts could also undermine the probability of paternity calculation.[10] We note that in *Smith v. Shaffer,* 511 Pa. 421, 515 A.2d 527 (1986), the Supreme Court of Pennsylvania held that a jury finding of nonpaternity was not against the weight of the evidence even though the probability of paternity was calculated to be 99.99 percent.

■ The probability of paternity can be made more accurate if HLA tests are conducted on more persons than just the mother, child, and putative father. For example, the only way of accurately knowing how the mother's and putative father's alleles are combined in haplotypes (and thus 99 percent of the time transferred to their children) is to test one of the mother's parents and one of the putative father's parents. Peterson, *Paternity Tests,* 22 Santa Clara L.Rev. at 696–98; *Joint AMA–ABA Guidelines,* 10 Fam.L.Q. at 276–77. In this case, Flora has the alleles that the child received from her father, but it is not known whether Flora has those same al-

---

**9.** The standard calculation does not consider the possibility of more than two consorts of the same racial or ethnic group, the possibility of two or more consorts of different racial or ethnic groups, or the possibility that two or more of the consorts may be related. Polesky & Lentz, *Interface,* 60 N.D.L.Rev. at 733. Evidence of this type affects the probability of paternity.

**10.** McCormick reports a case where the putative father was found to have a very high probability of paternity, but it was later determined that the man was sterile and could not possibly have fathered the child. E. Cleary, *McCormick On Evidence* § 211, at 661 (3rd ed. 1984).

leles combined as a haplotype. If one of Flora's parents can be tested, that uncertainty could be removed almost completely.

■ HLA tests can also be conducted on other alleged consorts. This evidence could enhance or decrease the probability of paternity, or it could prove paternity if all consorts but one are excluded and the factfinder determines that no other consorts were involved. However, tests should only be allowed on other alleged consorts when there is independent evidence that the other men had sexual intercourse with the mother during the time when conception could have occurred. Otherwise, a mother or a putative father could claim innocent men were involved in the hope that one or more might not be subject to exclusion.

3. *A Probability of Paternity Calculation Based on an Assumption of 50 Percent Probability Of Paternity Must Be 95 Percent Or Greater.*

■ Standard probability of paternity calculations have significance in proving paternity only within certain high numerical ranges. *Joint AMA–ABA Guidelines, supra,* published in 1976, states that a probability of paternity between 90 percent and 95 percent shows that it is "likely" that the putative father is the natural father, while a probability of paternity between 95 percent and 99 percent makes paternity "very likely." The Nordic countries, however, view a probability of paternity as significant *only if* it is 95 percent or higher. Peterson, *Paternity Tests,* 22 Santa

Clara L.Rev. at 700–01 (citing Valentin, *Exclusions and Attributions of Paternity: Practical Experiences of Forensic Genetics and Statistics,* 32 Am.J.Human Genetics 420, 429–30 (1980)) (hereinafter "Valentin, *Exclusions* ").[11] One commentator has written:

The significance of a "high" probability of paternity is difficult to evaluate. It is clear that nonexcluded nonfathers can score comparatively high probabilities of paternity (since most nonfathers are excluded, the rest must of necessity "fit" reasonably well). In one study, as many nonexcluded nonfathers scored over 88% as scored under 88%. On the average, fathers have higher probabilities of paternity than nonexcluded nonfathers (in the same study, the mean for fathers was 98.04%), so a paternity index must be rather high before it really differentiates the nonexcluded nonfathers from the (obviously nonexcluded) fathers. *There is no general agreement in the scientific community that a probability below 95% has significance.* Scientists generally agree that a probability greater than 95% (Paternity Index 19) is significant, so significance should be attached only to those probabilities exceeding 95%.

*Peterson,* at 707–08 (emphasis added; footnote omitted). Based on the foregoing and other authorities, we hold that only probabilities of paternity of 95 percent or greater should be admitted.[12] Furthermore, a percentage figure in the range above 95 percent may be translated for the factfinder into language that is more meaningful to

11. Even though evidence of probability of paternity is admissible if it reaches 95 percent, we note that scholars are not in complete agreement over the significance to attach to a 95 percent figure. Valentin states that probabilities between 5 percent and 95 percent show paternity is neither particularly probable nor particularly improbable, that probabilities between 95 percent and 99 percent indicate that paternity is rather probable, and that probabilities over 99 percent show that paternity is "probable." Valentin, *Exclusions.* The probability tables in *Joint AMA–ABA Guidelines,* however, are derived from a German researcher, Hummel, who writes that probability of paternity figures below 90 percent have undecided significance, between 90 percent and 95 percent

make paternity "likely," and between 95 percent and 99 percent make paternity "very likely." *Joint AMA–ABA Guidelines,* 10 Fam.L.Q. at 262. This difference in the language used to describe the significance to attach to a probability of paternity statistic suggests that factfinders and attorneys should carefully investigate *the significance* of any calculations that are testified to and be fully apprised that at any level the figures are not conclusive on the issue of paternity.

12. The Maryland legislature has mandated by statute that a probability of paternity must be at least 97.3 percent before it can be admitted as evidence in a paternity case. Md.Fam.Law Code Ann. § 5–1029 (1984).

the task at hand, such as "paternity is very likely." *Beausoleil*, 490 N.E.2d at 796. When probabilities of paternity in a particular case are based, for example, on the assumption that the mother had more than one consort, in addition to the putative father, the probabilities should not be admitted by a court to prove paternity unless the statistics have similar significance in proving paternity.

 In this case, the expert witness, using a 50 percent prior probability of paternity, determined that Flora's probability of paternity is 85 percent. The admission of this statistical evidence was clearly prejudicial error, and a new trial is therefore required. "Since a nonexcluded *nonfather is more likely to score 85 percent than a true father*, such a score not only does little to differentiate nonexcluded fathers from nonexcluded nonfathers, *but it may, if anything, be more probative of nonpaternity than paternity*." Peterson, *Paternity Tests*, 22 Santa Clara L.Rev. at 701 (emphasis added). The evidence should have been excluded under Rule 403 of the Utah Rules of Evidence.

4. *Probability of paternity evidence based on HLA tests may not be deemed conclusive on the issue of paternity.*

 From the foregoing, it should be apparent that evidence establishing the likelihood of paternity cannot be conclusive on the issue of paternity. It is simply more evidence the factfinder can consider. The factfinder must be free to disbelieve the assumptions made in arriving at the probability of paternity calculations. The factfinder may also attribute less weight to the calculations in light of other evidence that tends to disprove paternity, such as evidence that the mother was highly promiscuous during the time conception could have occurred. *See, e.g., Crain*, 104 Idaho at 672, 662 P.2d at 544 n. 6; *Beausoleil*, 490 N.E.2d at 796–97; *Davis*, 476 N.E.2d at 137; *In re Commissioner of Social Servic-*

es v. Murray, 112 A.D.2d 724, 492 N.Y.S.2d 214 (1985).

5. *Proper Foundation*

In *Phillips*, 615 P.2d 1228, this Court held that strict foundational requirements would have to be met before HLA evidence could be admitted in paternity trials.[13] The caution we expressed in *Phillips* concerning various aspects of HLA testing was well founded, and subsequent analysis and research have done much to clarify and refine the procedures necessary for forensic application of HLA tests. *See especially Beausoleil, supra*. We are now in a position to readdress foundational requirements.

The standards established above for admissibility assume a proper foundation that establishes reliability in the taking of blood samples and the performance of the tests. The validity of HLA tests can be destroyed if proper conditions and procedures are not established. Polesky & Lentz, *Interface*, 60 N.D.L.Rev. at 736–39; Comment, *Blood Test Evidence*, 59 Wash.U.L.Q. at 990–91, 1016–17. *See also* articles cited in footnote 3.

The American Association of Blood Banks (AABB) recently developed "Standards for Parentage Testing Laboratories" ("Standards") which address a number of important foundational concerns and provide a ready-made list of foundational requirements. The Standards are attached as an appendix to this opinion. They were derived from information gathered at a conference sponsored by the American Medical Association, the American Bar Association, and the AABB, Polesky & Lentz, *Interface*, 60 N.D.L.Rev. at 731, and establish the procedures that must be employed before a parentage testing laboratory may be accredited by the AABB.

The Standards were developed with paternity lawsuits in mind and are specifically tailored to provide accurate and reliable information at trial. They prescribe personnel and general policies for all testing;

---

**13.** We note that at least two other jurisdictions have specifically adopted certain foundational requirements discussed in *Phillips*. *See Tice v.*

*Richardson*, 7 Kan.App.2d 509, 644 P.2d 490 (1982); *Turek v. Hardy*, 312 Pa.Super. 158, 458 A.2d 562 (1983).

identification, specimen collection, and documentation procedures; red blood cell surface testing procedures; HLA testing procedures; red cell enzyme and serum protein testing procedures; immunoglobulin allotyping testing procedures; calculation and reporting requirements; and guidelines for tests involving DNA polymorphism.

The personnel policies of the Standards require that a parentage testing laboratory be under the direction of a person with a doctoral degree "who is qualified by advanced training and/or experience in parentage testing." Furthermore, the director and technical staff must participate in relevant continuing education, and a qualified individual must be available to act as an expert witness in paternity and other cases.

The Standards include general policies which require: (1) sufficient laboratory space, facilities, and supplies; (2) competent and adequate staff; (3) compliance with relevant safety codes; (4) utilization of a quality control program that is sufficiently comprehensive "to ensure that reagents, equipment, and personnel perform as expected"; (5) appropriate storage and usage of reagents; (6) proper handling, processing, and testing of samples; (7) performance of tests by standard methods or methods independently verified by the laboratory; (8) grading of serological reactions when appropriate; (9) maintenance of records of test results, including methods, observations, and interpretations; (10) maintenance of a written policy for the resolution of discrepancies between duplicate tests and/or interpretations; (11) participation in available external proficiency testing programs in all systems of phenotyping utilized by the laboratory; (12) testing of multiple systems "which provide a falsely accused man with, on the average, a 95 percent probability of obtaining evidence of nonpaternity," (i.e., a 95 percent probability of exclusion); (13) use of outside accredited testing and consultive sources when necessary to perform testing for systems not used by the laboratory or to aid in the resolution of specific problems in the identification of certain variants; (14) development and maintenance of a manual detailing all procedures and policies; and

(15) use of a standard method of nomenclature for describing phenotypes in each genetic system.

The Standards also provide for identification, collection, and documentation procedures to ensure that all persons and specimens tested are identified accurately and documented so that accurate identification in court will be possible and a chain of custody can be established.

Specific procedures and guidelines are also provided for testing the various genetic systems. The specific guidelines listed for HLA testing are set forth in the appendix.

Finally, the Standards delineate guidelines for calculating and reporting the results to ensure that the calculations are accurate and the reports are complete. The guidelines for calculation of the results include the review, verification, and approval by the laboratory director or supervisor of computer-assisted analyses; validation of the method of calculation, duplication of manual calculations, and calculation of gene and haplotype frequencies from populations of adequate size.

The reporting procedures require sending a written report to the "appropriate authorized individuals" which contains the date the samples were collected, the case number, the name of each individual tested and their relationship to the child, the racial origin(s) assigned by the laboratory to the mother and putative father for the purpose of calculation, the phenotypes established for each individual in each genetic system, a statement as to whether the putative father can be excluded, the basis for an opinion of nonpaternity, an explanation if the results are inconclusive, and the signature of the laboratory director. Furthermore, if there is a failure to exclude a putative father, the report shall include the individual Paternity Index for each genetic system reported, the Combined Paternity Index, the probability of paternity expressed as a percentage, the prior probabilities used to calculate the probability of paternity, and an explanation of other op-

tional mathematical expressions of the probability of paternity, if used.

By following the Standards, a parentage testing laboratory has done virtually all that can reasonably be done to ensure that the methods "employed and the particular test used in a given case were performed in accordance with proper procedures and with proper materials and equipment." *Phillips*, 615 P.2d at 1235. These standards ensure uniformity in testing, calculation, and reporting. The "Standards for Parentage Testing Laboratories" should be looked to for guidance in determining whether an HLA test is sufficiently reliable to be admitted.

 Therefore, before HLA test results can be admitted in a paternity trial, evidence must be produced that the particular tests relied upon in the case were conducted as specified by the Standards or in an equally reliable manner, regardless of whether the laboratory conducting the test is AABB accredited. The standards for the testing of other genetic systems are also adopted if the other genetic systems are relied upon by the laboratory in any given case to obtain a 95 percent mean probability of exclusion as is required by the Standards.

## IV. ADEQUACY OF HLA EVIDENCE IN THIS CASE

New tests should be conducted in this case if any HLA evidence is to be admitted at the new trial unless the HLA tests that were performed were conducted in compliance with the Standards. Otherwise, the accuracy of the test results is questionable. *See* Polesky & Lentz, *Interface*, 60 N.D.L. Rev. at 736–39; Comment, *Blood Test Evidence*, 59 Wash.U.L.Q. at 990–91, 1016–17.

 The Standards do not discuss who a qualified witness is. They merely require that a qualified individual be available to testify. Flora challenges the testimony of the expert in this case because the expert who testified did not personally conduct the tests or participate in any way in the testing. Since the case is being remanded for a new trial, we do not decide whether the

foundation established in the first trial was adequate. However, because a similar challenge may result during the new trial, we make the following observation. As long as a proper foundation is established for the admission of the HLA test results, a properly qualified expert who did not participate in the actual testing may interpret data that was produced by qualified persons, using proper and established standards, and testify to the test results. Utah R.Evid. 703, 705; *Shipp v. State*, 713 P.2d 10, 11 (Okla.1986). *See also State v. Thompson*, 503 A.2d 689, 692 (Me.1986). However, testimony from other qualified persons who participated in the testing may be necessary, depending on the circumstances, although that ordinarily would not be necessary if the testifying expert witness can describe the procedures used to produce the test results relied on. *Phillips*, 615 P.2d at 1236.

 Flora also challenges the admission of the HLA test result documents and the documents prepared by the blood laboratory when the blood samples were drawn. Again, we need not decide whether the documents were properly admitted, but since the Standards contemplate similar reports and records, we address the substance of the issue to avoid having to do so at a later date. The documents were admitted pursuant to the business records exception to the hearsay rule. That exception provides sufficient assurance of the integrity and trustworthiness of the documents as long as all the foundational requirements delineated herein have been met. *Shipp*, 713 P.2d at 11. This Court has previously held that hospital records carry "sufficient guarantees of trustworthiness to render them admissible in evidence and worthy of consideration by the factfinder." *Joseph v. W.H. Groves Latter Day Saints Hospital*, 7 Utah 2d 39, 43, 318 P.2d 330, 332–33 (1957). In any event, if it can be shown that HLA experts normally rely on the type of data contained in the documents and all other foundational requirements are met, the expert can testify concerning the data contained in the documents even if the documents are not admissible. Utah R.Evid. 703.

## V. STANDARD OF PROOF

Finally, Flora argues that the clear and convincing evidence standard should control paternity cases rather than the preponderance of the evidence standard that was used in this case. In *Roods v. Roods,* 645 P.2d 640 (Utah 1982), it was argued that the Court should change the standard in paternity cases to the beyond-a-reasonable-doubt standard. We rejected that argument and held that since paternity actions are appropriately classified as civil actions, the preponderance of the evidence standard should control. Since Flora presents no compelling reasons for elevating the standard, we reaffirm *Roods.*

Reversed and remanded for a new trial. Costs to appellant.

HALL, C.J., and HOWE, J., concur.

## APPENDIX

### Standards for Parentage Testing Laboratories

*Introduction*

For any of a number of reasons (emotional, historical, economic, rights and benefits, inheritance) it may be desirable and/or necessary to identify the biological parent of a given child. Although it is not possible to identify a given child's parent with *absolute* certainty, current technology, and technology being developed, permit the assignment of parentage with a very high probability.

When the identity of a particular father is uncertain, laboratory tests which define genetic markers can be employed to provide objective, impartial evidence. The evidence supplied by these tests may then serve to exclude a man from being the father of a given child or, if a man is not excluded, serve as the basis for calculating a probability that he is the father. The interpretation of test results must, therefore, be based upon careful evaluation of the phenotypes and knowledge of the genetic markers employed. Criteria utilized for the exclusion of paternity are the responsibility of the laboratory director.

Accuracy of test results requires a competent staff and a properly designed set of laboratory procedures. Laboratory standards should, while aiming at achieving the highest quality of performance, determine minimum levels of acceptable performance.

The Standards for Parentage Testing Laboratories have been developed by the Committee on Parentage Testing of the American Association of Blood Banks under a grant from the Federal Office of Child Support Enforcement of the Department of Health and Human Services and with the assistance of special consultants and representatives from the American Bar Association, American Medical Association, American Society of Clinical Pathologists, American Society for Histocompatibility and Immunogenetics and the College of American Pathologists. These Standards form the basis for the Parentage Laboratory Accreditation Program of the AABB and are subject to future revision as the state of the art and experience dictate.

The Committee solicited and incorporated recommendations from existing parentage testing laboratories in developing these Standards. In addition, the following documents are used as primary standards:

1. Standards for Blood Banks and Transfusion Services, 11th ed., 1984, AABB.
2. Standards for Histocompatibility Testing, 1984, ASHI.

and the following documents were used as additional resources:

1. Joint AMA–ABA Guidelines, Present Status of Serologic Testing in Problems of Disputed Parentage. Abbott JP, Sell KW, Krause HD, et al, *Family Law Quarterly* X:247–285, 1976.
2. Guidelines for Reporting Estimates of Probability of Paternity. Walker RH ed., Inclusion Probabilities in Parentage Testing, American Association of Blood Banks, Arlington, 1983, p. xiv.

The verbs "shall", "must" and "will" indicate mandatory requirements while "should" is used to denote compelling or recommended practices and "may" is used in a permissive sense.

▮▮▮▮▮▮▮▮▮▮

**P1.000** *Personnel and General Policies*

**P1.100** *Personnel*

**P1.110** The laboratory shall be under the direction of an individual with a doctoral degree who is qualified by advanced training and/or experience in parentage testing.

**P1.120** The competency of the technical staff shall be the responsibility of the director.

**P1.130** The laboratory director and technical staff shall participate in relevant continuing education.

**P1.140** A qualified individual must be available to act as an expert witness in the event that legal testimony related to the test results is required.

**P1.200** *General Policies*

**P1.210** The laboratory should have sufficient space, equipment, facilities and supplies to maintain safe and acceptable standards of performance.

**P1.220** The staff shall be competent and adequate for performance of the required testing.

**P1.230** The laboratory must be in compliance with relevant safety codes including provisions for safe handling of blood samples, reagents and proper disposal of wastes.

**P1.240** The laboratory shall utilize a program of quality control that is sufficiently comprehensive to ensure that reagents, equipment and personnel perform as expected. Tests must be performed using appropriate sample and reagent controls.

**P1.241** Reagents shall be stored and used appropriately.

**P1.242** Samples shall be handled, processed and tested in a manner that ensures accuracy of test results.

**P1.243** Tests must be performed by standard methods or by methods independently verified by the laboratory.

**P1.244** Serological reactions should be graded when appropriate.

**P1.245** Records of test results, including methods, observations and interpretations, shall be maintained.

**P1.246** There must be a written policy for the resolution of discrepancy between duplicate tests and/or interpretation.

**P1.250** The laboratory shall participate in available external proficiency testing programs in all systems of phenotyping utilized by the laboratory.

**P1.260** Testing of genetic markers in cases of disputed parentage shall include multiple systems which provide a falsely accused man with, on the average, a 95% probability of obtaining evidence of non-paternity.

**P1.270** An accredited laboratory may engage another laboratory to perform genetic testing for systems not used by the primary laboratory. In that event, the subcontracting laboratory shall, if not accredited by the Committee on Parentage Testing of the AABB for testing in those systems, meet the standards established by the Committee. The identity of the subcontracting laboratory and that portion of the report for which it bears responsibility shall be noted on the report.

**P1.280** Outside consultative sources should be used to aid in the resolution of specific problems or in the identification of certain variants. The primary laboratory will, however, bear the responsibility for issuing the report.

**P1.290** A manual detailing all procedures and policies shall be developed and maintained, and it shall be reviewed annually by the Director.

**P1.295** Laboratories shall use a standard method of nomenclature for describing phenotypes in each genetic system.

**P2.000** *Identification, Specimen Collection and Documentation*

**P2.100** *Individual and Specimen Identification*

**P2.110** There shall be a verifiable means for identification of all individuals who present themselves for testing.

**P2.120** There shall be a means for identification of specimens received from a

collecting facility outside of the laboratory doing the testing.

P2.130 A record must be kept at the testing facility of all identifying information including, but not limited to, name, relationship, race and place and date of collection of sample. Information about each individual shall be verified by the signature of that person or the guardian.

P2.140 The date of birth of the child shall be recorded.

P2.150 A transfusion history for the preceding three months shall be recorded for each individual tested.

P2.200 *Blood Samples*

P2.210 Blood samples shall be identified with a firmly attached label bearing a unique identification for each individual and the date of collection. The accuracy of the labeling process and the label itself should be verified by these individuals or by the guardian before the blood samples are removed from their presence.

P2.220 The phlebotomist's name must be a part of the permanent record.

P2.300 *Storage and Handling*

P2.310 Specimens shall be handled and stored in a manner which will preclude contamination, tampering or substitution.

P2.400 *Records*

P2.410 Records shall be maintained in a manner which will preserve their confidentiality and integrity.

P2.420 Laboratory personnel shall respect the privacy of the individuals who are being tested. Results of the test shall not be released in a manner in which the individual is identified, except when authorized.

P2.430 Copies of records that are released as part of an inspection must have the names of the tested individuals concealed.

P2.440 The records for each case shall be maintained for a minimum of five years; thereafter as long as deemed necessary by the institution.

P2.450 The Director (or his/her designee) shall review and initial all worksheets to verify that the duplicate observed results are in agreement and are correctly interpreted as phenotypes on the Report Form.

P3.000 *Red Blood Cell Surface Antigen Testing*

P3.100 Tests shall be performed twice, independently.

P3.200 Different sources of reagents should be used.

P3.300 Red cell typing reagents shall be shown to be reactive and specific on the day of use by the method employed.

P3.400 Reagents used in titrations to establish zygosity must be shown to demonstrate a significant dosage phenomenon by a standard scoring method, on the day of use, with known homozygous and heterozygous controls.

P4.000 *HLA Testing*

P4.100 HLA typing should include all HLA–A and –B antigens which were officially recognized by the 1980 HLA Nomenclature Committee of the World Health Organization (WHO).* Laboratories may also type for other recognized HLA specificities for which the laboratory can obtain appropriate typing antisera.

P4.200 Terminology of HLA antigens shall conform to the latest report of the WHO Committee on Nomenclature. Designation of other antigens shall not conflict with WHO nomenclature.

P4.300 The reactivity of complement in each test shall be adequately controlled.

P4.400 Cell viability must be recorded and should exceed 80%.

P4.500 HLA typing of all individuals in a paternity case should be performed with the same techniques and reagents and in the same laboratory.

P4.600 Each HLA–A and –B antigen shall be defined by at least two differ-

* List available on request

ent operationally monospecific sera, or by one monospecific serum plus two multispecific sera, or by three multispecific sera.

P4.700 Each HLA antigen shall be tested on two independent trays or tray sets. Each tray must be read independently.

P5.000 *Red Cell Enzymes and Serum Proteins* (Electrophoresis)

P5.100 Tests shall include controls appropriate for the test system used.

P5.101 Each electrophoretic run must include (a) control(s) expressing a minimum of 2 allotypes.

P5.102 Controls used to identify rare variants must be verified by an independent laboratory.

P5.200 There shall be two independent readings of the electrophoretic patterns.

P5.300 In addition to isoelectric focusing tests, conventional electrophoretic techniques should be performed when both methods are necessary to identify common allotypes.

P6.000 *Immunoglobulin Allotyping* (Hemagglutination Inhibition)

P6.100 Tests shall be performed twice, independently.

P6.200 Positive and negative controls shall be run each day to ensure reactivity of reagents.

P6.300 Dosage titrations, if done, should be done in conjuction with adequate controls.

P6.400 Immunoglobulin allotyping shall not be performed on children less than six months of age.

P7.000 *Calculations and Reports*

P7.100 *Calculations*

P7.110 Computer assisted analyses shall be reviewed, verified and signed by the Supervisor and/or Laboratory Director before issue.

P7.120 The method of calculation shall be validated.

P7.140 If only manual calculations are done, they shall be done in duplicate.

P7.140 Gene and haplotype frequencies should have been obtained from examination of populations of adequate size.

P7.200 *Reports*

P7.210 A written report shall be issued to the appropriate authorized individuals following completion of the tests.

P7.220 The report shall contain at least:

P7.221 The date(s) of collection of the samples.

P7.222 The institution's accession (case) number, if assigned.

P7.223 The name of each individual tested and the relationship to the child.

P7.224 The racial origin(s) assigned by the laboratory to the mother and alleged father(s) for the purpose of calculation.

P7.225 The phenotypes established for each individual in each genetic system examined.

P7.226 A statement as to whether or not the alleged father can be excluded.

P7.230 If an opinion of non-paternity is rendered, the basis for the opinion shall be provided.

P7.240 If there is a failure to exclude, the report shall include:

P7.241 The individual Paternity Index for each genetic system reported.

P7.242 The combined Paternity Index.

P7.243 The probability of paternity expressed as a percentage. The prior probabilities used to calculate the probability of paternity shall be stated.

P7.244 Other mathematical or verbal expressions are optional. If they are included in the report, such expressions should be defined and explained.

P7.250 An explanation as to the nature of the problem shall be given if the results are inconclusive.

P7.260 The signature of the laboratory Director.

Guidelines for tests involving DNA Polymorphism

It is premature to develop specific technical standards for the use of DNA technology in parentage testing until more laboratories have used the test methods. However, in this early stage certain guidelines seem appropriate to insure the smooth acceptance of the technology in both the parentage testing laboratory and the courts.

1. DNA probes should be validated by extensive family and population testing before being used in parentage testing.
2. Reports listing the results of probe testing shall specify the probe and restriction enzyme used as well as the results obtained.
3. Confirmatory testing by an independent laboratory shall be possible for restriction fragment length polymorphism results.
4. It is premature to accept the results of parentage testing using DNA probe technology as the only test for paternity at this time except where other test methods are not possible.

Certain areas of DNA technology should be addressed by standards in the future. These include:

1. Controls for complete DNA digestion.
2. Duplication in testing; i.e., duplicate gels and blots.
3. The use of DNA sizing standards.
4. Gene frequencies and mutation rate estimations for the genes being detected.

Revised 04/16/86

ZIMMERMAN, Justice (concurring):

I join in the opinion of the majority. However, I also subscribe to the views expressed by Justice Durham in her separate concurrence. Although the majority opinion contains some language suggesting that the so-called "*Frye* test" is still the law, most of the rest of the opinion recognizes, I believe, that *Frye's* traditional exclusive reliance on only one factor—general acceptance within the scientific community of a particular fact or procedure—has been displaced under Rule 702 and that "general acceptance" is only one of several factors that may be considered under Rule 702 to determine whether "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue...." This is a development which was presaged in Justice Stewart's opinion for the court in *Phillips v. Jackson,* 615 P.2d 1228, 1234 (Utah 1980).

DURHAM, Justice (concurring in the result):

I concur in the result reached by the majority opinion, but cannot join in all of the discussion of Rule 702 of the Utah Rules of Evidence. I am persuaded that Rule 702 should be analyzed and applied on its own terms independent of the so-called "*Frye* test." That is not to say that general acceptance of a scientific fact or procedure may not have a bearing on reliability. I think the following commentary offers a correct interpretation of the approach (a "relevancy analysis") courts should take to determine the reliability of novel scientific evidence under Rule 702:

As with other kinds of expert testimony, the relevancy and prejudice analyses implicated in Rule 702's helpfulness standard must be utilized. First, the court must assess the probative value of the proffered evidence. Although this may often prove difficult, since the court will only rarely have any personal scientific expertise, there are a variety of factors which the court can consider. Whether or not the scientific principles involved have been generally accepted by experts in the field may still have a bearing on reliability and consequent probative value of the evidence. "A technique unable to garner *any* support, or only miniscule support, within the scientific community, would be found unreliable by a court." The expert's qualifications and stature, the use which has been made of the new technique, the potential rate of error, the existence of specialized literature, and the novelty of the new invention, may all enter into the court's assessment. Opinions which are based in large measure on a subjective analysis may have less probative value because it may be difficult

to evaluate the skill of the expert in extrapolating a judgment from the scientific data.

After assessing probative value, the court must also assess the dangers posed by this particular kind of expert scientific evidence. The court will have to evaluate the degree to which the jurors might be over-impressed by the aura of reliability surrounding the evidence, thereby leading them to abdicate their role of critical assessment. In making this determination the nature of the evidence may be significant. Some scientific evidence merely guides the jury in making its own assessment of the evidence; in other instances, the jury may be incapable of estimating the accuracy of the expert's conclusions by reference to the data on which the expert relies. Confusion of the jury, and the inordinate consumption of trial time are other dangers for the court to consider. See Rule 403.

In balancing the probative worth of the novel scientific evidence against the dangers specified in Rule 403, the court must also consider such factors as the significance of the issue to which the evidence is directed, the availability of other proof, and the utility of limiting instructions. The court may also be influenced by the extent to which the issues posed by this novel evidence were explored prior to trial, and whether the party opposing admissibility is adequately prepared. The availability of competent experts to explore the limitations of the novel technique may also enter into the court's calculus.

The result under the *Frye* test or a relevancy analysis will often be the same, but the latter approach gives courts a latitude which they do not possess under the general scientific acceptance rule. Instead of assuming inadmissibility unless the independently controlling standard of *Frye* is satisfied, the relevancy approach favors admissibility whenever the general conditions for the admissibility of evidence have been met. This approach is in accord with the general tenor of the Federal Rules—which favor the admissibility of relevant evidence—as well as the other rules in Article VII governing the use of expert testimony.

3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[03], at 702–18 to 702–21 (1985) (footnotes omitted).

I agree with the Third Circuit Court of Appeals that "a particular degree of acceptance of a scientific technique within the scientific community is neither a necessary nor a sufficient condition for admissibility; it is, however, one factor that a district court normally should consider in deciding whether to admit evidence based upon the technique." *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir.1985). I believe this more flexible approach is in effect what the majority opinion utilizes; however, I feel that the majority's emphasis on *Frye* criteria, without fully integrating them into a relevancy analysis, is misleading. I would articulate the test solely in terms of reliability, with general scientific acceptance used only as a factor in the reliability assessment.